465 S.E.2d 601

**In re Application of Teresa Jane DAI-
LEY for State License to Carry a
Concealed, Deadly Weapon.**

**State of West Virginia, Intervenor.**

No. 22964.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 12, 1995.

Decided Nov. 16, 1995.

Concurring Opinion of Justice
Workman Nov. 22, 1995.

Darrell V. McGraw, Jr., Attorney General, Dawn Warfield, Deputy Attorney General, Charleston, for State of West Virginia.

RECHT, Justice:

The matter is before this Court upon a certified question from the Circuit Court of Cabell County that challenges the constitutionality of W.Va.Code 61–7–4 (1995), the statute that empowers the various circuit courts of this State with the authority to issue a license to carry a concealed, deadly weapon. The precise constitutional challenge is whether the Legislature, through the valid exercise of its police powers to reasonably regulate the right of a person to carry a concealed, deadly weapon, unlawfully delegated those powers to the judicial department in contravention of the division of powers provision of article V, section 1 of the West Virginia Constitution.[1]

The Court has before it the Petition for Certified Question, all matters of record and the brief of the State of West Virginia as Intervenor.[2]

## I.
## PROCEDURAL BACKGROUND

On June 15, 1995, Teresa Jane Dailey applied to the Circuit Court of Cabell County for a license to carry a concealed, deadly weapon, pursuant to W.Va.Code 61–7–4 (1995). In her verified application, Ms. Dailey represented that she was a citizen of the United States, a resident of Cabell County, and was at least eighteen (18) years of age; that she was not addicted to alcohol or a controlled substance, had not been convicted of a felony or any act of violence involving a deadly weapon, and desired to carry a concealed, deadly weapon for a lawful purpose;

Teresa Jane Dailey, Pro Se.

1. West Virginia Constitution article V, section 1 provides:

The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature.

2. The Petition for Certified Question was filed, *pro se*, by Teresa Jane Dailey, the applicant for the license to carry a concealed, deadly weapon.

This Court, by order entered the 29th day of June, 1995, granted review of the certified question and further ordered the Attorney General of the State of West Virginia to intervene in this matter on behalf of the State of West Virginia. The brief filed by the State of West Virginia urging this Court to declare that W.Va.Code 61–7–4 (1995) unconstitutional when measured against the separation of powers provision of the West Virginia Constitution was very helpful in the resolution of this matter.

that she was physically and mentally competent to carry a deadly weapon, and had satisfied the minimum requirements for handling and firing such firearms. Accompanying her application was a copy of a Certificate dated May 27, 1995 which certified that she had successfully completed a course in Firearms Training and Safety sponsored by the Cabell County Sheriff's Department. In short, the applicant satisfied the eight qualifiers necessary to obtain a license to carry a concealed, deadly weapon stipulated in W.Va.Code 61–7–4 (1995).

The application was assigned to the Honorable L.D. Egnor, Judge of the Circuit Court of Cabell County. By decision entered June 21, 1995, Judge Egnor held that the issuance of such a license is an exercise of the police power of the State and as such the circuit courts lacked jurisdiction of the subject matter "to perform this ministerial and administrative police act." Accordingly, the Petitioner's application not being cognizable by the court was "rejected and held for naught."

In its Order of Certification of Question at Law, the circuit court held:

> The Court, as stated in the Order attached, believes the issuance of a concealed weapon license is an exercise of police power and as such is a legislative function of the State. It is not a judicial function and cannot be made the subject of the exercise of judicial power. The Court therefore lacks jurisdiction of the application which is the subject matter herein.
>
> It is, therefore, a violation of Article V, Section 1 of the West Virginia Constitution for the legislature to impose upon the judiciary[,] legislative and executive powers through West Virginia Code Section 61–7–4.

The posture of this matter is such, that as a question of first impression, we are re-

quested to determine the constitutional boundaries of W.Va.Code 61–7–4 (1995) as measured against the separation of powers clause of the West Virginia Constitution. We agree with the conclusion of the circuit court and find that W.Va.Code 61–7–4 (1995) constitutes a legislative delegation of powers and duties to the various circuit courts of this State which are non-judicial in character, are not incidental to the judicial function and are therefore unconstitutional, invalid and in violation of article V, section 1 of the West Virginia Constitution.

## II.
## HISTORICAL OVERVIEW OF THE DOCTRINE OF SEPARATION OF POWERS

This case is about the preservation of the equilibrium of power among the three departments of government so that "a gradual concentration of the several powers in the same department" can be resisted. The Federalist No. 51, at 354 (James Madison) (1917).

The principles of the separation of powers were considered by the Framers of the Federal Constitution as the core guarantee of a just government. James Madison observed that, "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than that the legislative, executive and judicial departments be separate and distinct.[3] The Federalist No. 47, at 329 (James Madison) (1917). The only alternative to maintaining and preserving the separation of the functions of government was tyranny.

The simplicity and yet the strength of avoiding the accumulation of power in the same departments which is the "very definition of tyranny" (The Federalist No. 47, at 329) (James Madison) (1917) is best ex-

---

**3.** The United States Constitution does not express the separation of powers in a single article. Instead, the separation of powers requirement is derived from the statements of the powers of each branch of government as embraced in each of the three articles of the Constitution: article I, section 1 (legislative power vested in Congress of the United States); article II, section 1, clause 1 (executive power shall be vested in a President of the United States); and article III, section 1 (judicial power vested in one Supreme Court and various inferior courts). Conversely, the separation of powers provision is fused in a single article in West Virginia Constitution article V, section 1, and thereafter the functions of the three branches of government are defined in separate articles: article VI (legislative powers); article VII (executive powers); and article VIII (judicial powers).

pressed in The Federalist No. 47 when James Madison, in quoting the "oracle" of the doctrine of the separation of powers, Baron de Montesquieu recognized that:

The reasons on which Montesquieu grounds his maxim are further demonstration of his meaning. 'When the legislative and executive powers are united in the same person or body ... there can be no liberty, because apprehensions may arise lest THE SAME monarch or senate should ENACT tyrannical laws to EXECUTE them in a tyrannical manner ... Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for THE JUDGE would then be THE LEGISLATOR. Were it joined to the executive power, THE JUDGE might behave with all the violence of AN OPPRESSOR.' Some of these reasons are more fully explained in other passages; but briefly stated as they are here, they sufficiently establish the meaning which we have put on this celebrated maxim of this celebrated author.[4]

The Federalist No. 47, at 332) (James Madison) (1917) (emphasis supplied).

This then is the historical atmosphere that we approach the examination of whether the statute vesting in the circuit courts of this State, the power to issue permits to carry concealed, deadly weapons, W.Va.Code 61–7–4 (1995), is unconstitutional in violation of article V, section 1 of the West Virginia Constitution.

## III.
## SEPARATION OF POWERS JURISPRUDENCE IN WEST VIRGINIA

The commitment of this Court to a strict application of the doctrine of separation of powers, while ambiguous in two areas unrelated to the subject matter of the case *sub judice*, has in all other respects been unwavering.[5]

The seminal opinion which sanctions the doctrine of separation of powers is generally recognized as *Hodges v. Public Service Commission*, 110 W.Va. 649, 159 S.E. 834 (1931).[6] *Hodges* arose out of a controversy involving the Water Power Act of 1929, W.Va.Code 31–9–1 (1929), which provided for an appeal from any decision of the Public Service Commission to the Circuit Court of Kanawha County. The appeal was reviewed de novo. The Court, speaking through Judge Hatcher, held that since it was apparent that the Legislature intended for the circuit court to try and determine whether an applicant should receive a water power license, an obvious legislative function, on a de novo

---

4. While it serves no useful purpose to burden this opinion with a complete bibliography of all the literature on this subject, as a matter of some interest reference is made to the contribution of John Locke to the evolution of the doctrine of the separation of powers. An excellent discussion contrasting the writings of Baron de Montesquieu and John Locke on this subject is found in Suri Ratnapala, *John Locke's Doctrine of the Separation of Powers: A Re-evaluation*, 38 Am.J.Juris. 189 (1993).

5. The first unrelated case which appears to be *sui generis*, involved empowering circuit courts with jurisdiction over legislative matters involving the valuation of property for taxation on appeal. *See Mackin v. Taylor County Court*, 38 W.Va. 338, 18 S.E. 632 (1893).

The second unrelated matter is more complex and was designed to elevate public policy doctrine over the doctrine of separation of powers. It involved the power of a circuit court to grant certificates of incorporation to municipalities within certain levels of population. *See In re Town of Union Mines*, 39 W.Va. 179, 19 S.E. 398

(1894). We questioned the wisdom of the delegation of essentially a legislative function to a circuit court in *In re Proposal to Incorporate Town of Chesapeake*, wherein this Court chose to consider this particular legislative delegation as an exception to the sound rule of separation of powers, based upon broad grounds of public policy to avoid the "unsettling of municipal governments in this State." *In re Proposal to Incorporate Town of Chesapeake*, 130 W.Va. 527, 536, 45 S.E.2d 113, 118 (1947); *see also Wiseman v. Calvert*, 134 W.Va. 303, 59 S.E.2d 445 (1950), where this Court completely isolated this category of cases from the separation of powers jurisprudence and disapproved the result without overruling those line of cases, again on public policy grounds.

6. Two excellent commentaries on *Hodges*, each taking competing positions, are contained in Kenneth C. Davis, *Judicial Review of Administrative Action in West Virginia—A Study in Separation of Powers*, 44 W.Va.L.Q. 270 (1938), and Robert T. Donley, *The Hodges Case and Beyond*, 45 W.Va.L.Q. 291 (1939).

basis, without regard to the findings of the Commission, then the statute was unconstitutional in violation of article V, section 1 of the West Virginia Constitution. The syllabus in *Hodges* is simply stated as, "[t]he Legislature cannot commit to the judiciary powers which are primarily legislative. Article V of the Constitution applied." Syllabus, *Hodges,* 110 W.Va. 649, 159 S.E. 834.

The reasoning of *Hodges* which survives to shape the contours of the analysis of the statute under consideration in the case *sub judice,* is "that the plain language of article 5 calls, not for construction, but only for obedience." *Hodges,* 110 W.Va. at 655, 159 S.E. at 836. Obedience to article V, section 1 of the West Virginia Constitution led the Court in *Hodges* to conclude that both legislative encroachment into the power of the judiciary, as well as legislative relinquishment of power to the judicial branch, were vices to be condemned in violation of both the letter and the spirit of the doctrine of separation of powers. *See* Robert T. Donley, *The Hodges Case and Beyond,* 45 W.Va.L.Q. 291, 297 (1939).

Next in the developing body of law of this State examining a statute within the context of article V, section 1 is *Sims v. Fisher,* 125 W.Va. 512, 25 S.E.2d 216 (1943). *Sims,* which contains an excellent historical discussion of the doctrine of separation of powers required this Court to examine a statute which vested in the circuit courts the power to sell lands for the benefit of public schools. The statutory scheme which was found to be unconstitutional as measured against article V, section 1, was that the circuit court, without first finding whether or not certain lands were subject to sale, served in an administrative capacity in ordering the sale of lands.

It is within the language of *Sims* that we have a clear vision of the unyielding commitment of the courts of this State to assure that the three departments of government remain separate:

> In view of these holdings we think it clear that this Court has settled on a policy of strong adherence to the several constitutional provisions relating to the separation of powers, as conferred on the three departments of the State government, and particularly as to the jurisdiction of courts,

and the powers they may assume or decline to exercise. Further, that any departure from this strict rule in the past, shall not be permitted to operate as a precedent for additional violations of these provisions now or in the future, under whatever guise such a proposition may be presented. This is as it should be. The Constitution has wisely provided for its amendment, and the way being open therefor, courts are not justified in assuming powers not granted, even though asked to do so by legislative enactment. In this case, the Legislature has required of the circuit courts, and this Court, the exercise of functions not of a judicial nature, and has plainly stated its intent and purpose in that regard. In the same enactment it has required of circuit courts the performance of duties which it terms "judicial" as distinguished from what it terms "its capacity as an administrative agency for the sale of state lands." With all deference to the will of the Legislature, we do not think it possesses the power to require any court to act as an "administrative agency"; and any court which acts in such capacity violates the plain provisions of our Constitution. We are of the opinion, therefore, that the provisions of Article 4, Chapter 117, Acts 1941, which assumes to require the performance of administrative duties by circuit courts, in connection with the sale of lands for the benefit of the school fund, is plainly unconstitutional.

*Sims,* 125 W.Va. at 524–525, 25 S.E.2d at 222.

*Sims* served as a precursor to the opinion that in our view today is dispositive of the question as to the constitutional validity of W.Va.Code 61–7–4 (1995). In *State v. Huber,* 129 W.Va. 198, 40 S.E.2d 11 (1946), we were concerned about a statute which empowered the circuit courts with concurrent jurisdiction with the Nonintoxicating Beer Commissioner of this State to revoke or suspend licenses issued by the Commissioner to sell or distribute nonintoxicating beer. The Court speaking through Judge Fox illuminated some of the more obscure and complex nuances of the doctrine of separation of powers, by undertaking to define the various

functions of government and then determining whether the Legislature had encroached or relinquished those functions to another branch.[7]

After an exhaustive analysis of the sanctions of maintaining separate departments of government, this Court concluded that:

[C]onsiderations of high public policy, and the plain terms of our Constitution, impel us to the conclusion that the licensing and regulation of the sale and distribution of nonintoxicating beer is the exclusive function of the legislative department of our Government, under the police power of the State; is not a judicial function; and cannot be made the subject of the exercise of judicial power, save only in cases where, in the exercise by the Legislature of its power in the premises, there is a violation of the Constitution, or the laws of the State, or some arbitrary or fraudulent exercise of that power, or where its exercise is without excuse or without evidence, which in itself would be an arbitrary exercise of power. Then, and then only may judicial power be invoked. This power, as we have said, may be invoked by direct appeal to the courts, or where the administrative power is improperly used, through the processes of the courts by way of appeal, writ of error or certiorari . . . .

7. If the bench and bar of this State were given the choice to understand the subject of the separate and independent organs of government through only a single source, that source should be Judge Fox's opinion in *Huber*, 129 W.Va. 198, 40 S.E.2d 11.

8. We do not intend for the cases which we have cited under the rubric of separation of powers jurisprudence in West Virginia to be exhaustive of this subject. These cases are more prominent and guide the outcome of this matter. Justice Miller in *Appalachian Power Company v. Public Service Commission*, catalogued numerous cases on this subject beyond what need be contained in this opinion. *Appalachian Power Co. v. Public Service Comm'n*, 170 W.Va. 757, 296 S.E.2d 887 (1982) (discussing the unconstitutional legislative delegation of contempt powers, which is a judicial function, to an administrative agency).

9. The modern version of the statutory scheme which delineated the proceedings to obtain a license to carry a dangerous weapon prior to the Amendment was enacted during the Extraordinary Session in 1925. 1925 W.Va.Acts (First Extraordinary Sess.) ch. 148, § 7. *See generally,*

*Huber*, 129 W.Va. at 221–222, 40 S.E.2d at 25.

Having examined the historical perspective of the separation of powers doctrine, as well as the jurisprudence of that doctrine in this State, we are prepared to apply these principles and precedents to the statutory scheme by which licenses are issued by circuit courts to carry concealed, deadly weapons under the provisions of W.Va.Code 61–7–4 (1995).[8]

## IV.
## THE STATUTORY SCHEME

The regulation of the right to bear arms in this State must be measured in terms of the ratification on November 4, 1986, of article III, section 22 of the West Virginia Constitution which is commonly referred to as the "Right to Bear Arms Amendment" (hereinafter "Amendment").

Prior to 1986, and for a period of approximately 70 years, there was no significant change in the regulatory scheme controlling the licensing of the carrying of dangerous weapons.[9]

Following the passage of the "modern license law" in 1925, and prior to the Amendment, no person was permitted to carry a dangerous or deadly weapon without a license.[10]

James W. McNeely, *The Right of Who to Bear What, When, and Where—West Virginia Firearms Law v. The Right-to-Bear-Arms Amendment*, 89 W.Va.L.Rev. 1125, 1136–1141 (1987).

10. W.Va.Code 61–7–1 (1975) provides in pertinent part:

If any person, without a state license therefor or except as provided elsewhere in this article and other provisions of this Code, carry about his person any revolver or pistol, dirk, bowie knife, slung shot, razor, billy, metallic or other false knuckles, or other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and, upon conviction thereof, shall be imprisoned in the county jail not less than six nor more than twelve months for the first offense; but upon the conviction of the same person for the second offense in this State, he shall be guilty of a felony, and, upon conviction thereof shall be imprisoned in the penitentiary not less than one nor more than five years, and, in either case, shall be fined not less than fifty dollars nor more than two hundred dollars.

The protocol for obtaining a license to carry a deadly weapon was expressed in W.Va.Code 61–7–2 (1988) which had some similarity to the structure of the current statute governing the procedure to obtain a license to carry a concealed, deadly weapon, but there are significant differences in the two schemes. The only common element of the two statutes speaks in terms of the circuit court being the issuing agency, however, the conditions upon which the circuit court grants the license are substantially different.

Under the prior statute, W.Va.Code 61–7–2 (1988), the applicant for a license was required to: (1) publish a notice of the application in a newspaper of general circulation; (2) file an application showing that the applicant was, (a) a citizen of the United States; (b) a bona fide resident of West Virginia for at least one year prior to the date of the application and that the applicant was a resident in the county in which the application was filed for a period of sixty days prior the filing of the application; (c) over 18 years of age; (d) a person of good moral character, of temperate habits, not addicted to intoxication, not addicted to the use of any controlled substance, and has not been convicted of a felony or of any offense involving the use of a weapon in an unlawful manner; (e) gainfully employed in a lawful occupation and had been so for a period of five years prior to the filing of the application; (f) qualified under certain minimum requirements for handling and firing weapons; and (3) state the purpose for which the applicant intends to carry the weapon, the necessity for carrying the weapon and the county or counties for which the license is desired.

Following the filing of the application, the circuit court was authorized to hear evidence on all matters not only on the application, but also upon any other matters that the court would deem to be relevant. The circuit court thereafter had the discretion to either grant or deny the application. Of particular significance is the empowerment to the circuit court to make a determination as to whether or not there existed good reason and cause for the applicant to carry a deadly weapon. Specifically, W.Va.Code 61–7–2(c) (1988) provides in pertinent part:

> Upon the hearing of such application, the court shall hear evidence upon all matter stated in such application and upon any other matters deemed pertinent by the court, and if such court be satisfied from the proof that there is good reason and cause for such person to carry such weapon, and all of the other conditions of this article be complied with, the court, or the judge thereof in vacation, may grant such license for such purposes, and no other
>
> . . . .

After the Amendment was ratified, this Court examined W.Va.Code 61–7–1 (1975) which prohibited the carrying of a deadly weapon without a license within the context of the Amendment [11] in *State ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 377 S.E.2d 139 (1988). We held in *Buckner* that the statutory proscription of carrying a deadly weapon without a license expressed in W.Va.Code 61–7–1 (1975) was overbroad in that it infringed upon the right of a person to bear arms for self-defense purposes and other purposes described within the Amendment, and therefore was unconstitutional. Syllabus Point 2, *Buckner*, 180 W.Va. 457, 377 S.E.2d 139.

However, in *Buckner* we did acknowledge that it was within the police power of the Legislature to enact legislation which would impose reasonable regulatory controls over the constitutional right to bear arms. Syllabus Point 4, *Buckner*, 180 W.Va. 457, 377 S.E.2d 139. A specific caveat was contained in *Buckner* to the extent that no regulatory control could emasculate the constitutional  protection of the Amendment. Syllabus Point 4, *Buckner*, 180 W.Va. 457, 377 S.E.2d 139.

In the wake of *Buckner*, the Legislature in 1989 recodified the statutes regulating dangerous weapons which were designed to be in conformity with the Amendment. The most significant changes resulting from this codifi-

---

**11.** The exact language of article III, section 22 of the West Virginia Constitution is as follows:

A person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use.

cation was the statute which established the protocol to obtain a license to carry a concealed, deadly weapon as contained in W.Va. Code 61–7–4 (1989), the precise statute which is challenged in this proceedings.[12]

The regulatory scheme chosen by the Legislature was directed only to licensing of concealed, deadly weapons without any control of deadly weapons which would not be concealed with the exception of certain restrictions on the possession of machine guns. W.Va.Code 61–7–9 (1989). Also in 1995, more stringent sanctions were imposed regarding the possession of weapons on premises of educational facilities and premises housing courts and family law masters. W.Va.Code 61–7–11a (1995). None of these statutes has been challenged in these proceedings. Once again, in the post-Amendment regulatory scheme, the Legislature chose the circuit court as the agency vested with the power to grant the license to carry the concealed, deadly weapon. However,

this is where the similarity stops vis-a-vis the prior licensing statute contained in W.Va. Code 61–7–2 (1988).

Specifically, the protocol embraced within W.Va.Code 61–7–4 (1995) is nothing more than a judicial endorsement of a license application. Once an applicant demonstrates that the eight qualifiers are satisfied, the circuit court has no choice but to grant the permit. There is a weak attempt in the statute to suggest that the court has some discretion in whether or not to grant the permit, however this discretion is symbolic at best. A careful reading of W.Va.Code 61–7–4(b) (1995) tells the circuit court that while it has the right to hear evidence on all matters, there is no structure for developing evidence by any person other than the applicant, and there is no mechanism provided to create an adversary proceeding. The only evidence that can be heard is confined to the matters contained in the application since the hearing is redundantly expressed to be upon "all

---

12. W.Va.Code 61–7–4(a) (1995) provides in pertinent part that an individual desiring to obtain a license to carry a concealed, deadly weapon must file a verified application with the clerk of the circuit court setting out certain discreet requirements which are:

(1) That the applicant is a citizen of the United States of America or lawfully resides in the United States of America;

(2) That, on the date the application is made, the applicant is a bona fide resident of this state and of the county in which the application is made;

(3) That the applicant is eighteen years of age or older;

(4) That the applicant is not addicted to alcohol, a controlled substance or a drug, and is not an unlawful user thereof;

(5) That the applicant has not been convicted of a felony or of an act of violence involving the misuse of such deadly weapon;

(6) That the applicant desires to carry such deadly weapon for the defense of self, family, home or state, or other lawful purpose;

(7) That the applicant is physically and mentally competent to carry such weapon;

(8) That, in the case of a person applying for a license to carry a concealed pistol or revolver, the applicant has qualified under minimum requirements for handling and firing such firearms. These minimum requirements are those promulgated by the department of natural resources and attained under the auspices of the department of natural resources: Provided, That the court shall waive this requirement in

the case of a renewal applicant who has previously qualified: Provided, however, That the following may be substituted for those minimum requirements promulgated by the department of natural resources:

(A) Successful completion of any official national rifle association firearms safety or training course;

(B) Successful completion of any firearms safety or training course or class available to the general public offered by an official law-enforcement organization, community college, junior college, college, or private or public institution or organization or firearms training school, utilizing instructors currently certified by the national rifle association;

(C) Successful completion of any firearms training or safety course or class conducted by a firearms instructor certified as such by the state or by the national rifle association.

Subsection (b) of the statute contains what the circuit court is to do once an application is filed:

(b) The court shall issue or deny such license within thirty days after the application is filed with the circuit clerk. The court shall, if necessary, hear evidence upon all matters stated in such application and upon any other matter related to the eligibility of the applicant under subsection (a) of this section. If from such application or the proof it appears that the purpose for such person to carry such weapon is defense of self, family, home or state, or other lawful purpose, and all other conditions in subsection (a) are complied with, the court, or the judge thereof in vacation, *shall* grant such license.

matters stated in [the] application, and upon any other matter relat[ing] to the eligibility ... under subsection (a)," *which as it turns out are the matters already stated in the application.* W.Va.Code 61–7–4(b) (1995).

The statute also contains other provisions which effectively eviscerate any judicial discretion when it compels the granting of the license if all qualifiers on the application are satisfied including proof that the purpose for which the concealed, deadly weapon is to be used is for defense of self, family, home or state or other lawful purpose which, as it turns out, is item six in the list of qualifiers. This analysis of W.Va.Code 61–7–4(b) (1995) clearly demonstrates that as an applicant satisfies all eight qualifiers described in W.Va.Code 61–7–4(a) (1995), the circuit court has no alternative than to grant the license.

As will be discussed in the next section of this opinion, to the extent that some judicial discretion is a prerequisite to satisfying the judicial function test under the separation of powers doctrine, W.Va.Code 61–7–4 (1995) contains no such discretion. Many attempts have been made and failed in an effort to develop bright line definitions of legislative, executive and judicial power within the meaning of the separation of powers provision of the West Virginia Constitution. *State v. Huber* comes closest to providing a working definition of judicial power when it states:

> The courts are open to a hearing on any complaint, where powers are exceeded, or for any other reason involving legal rights, the solution of which involves the exercise of judicial power.[13]

W.Va.Code 61–7–4(b) (1995) (emphasis added).

13. This definition is expressed in terms of the constitutional provision delineating circuit court jurisdiction under article VIII, section 12 which was in effect until the Judicial Reorganization Amendment, S.J.Res. 6, 61st Leg., Reg.Sess., 1974 W.Va.Acts 946, ratified by general election in 1974. This amendment rewrote article VIII, section 12 as article VIII, section 6 as contained in the current Constitution, which while different in form is not substantively different insofar as the powers of the circuit court are concerned.

14. There is no reported case of *Metheney II* since it is represented by an order of this Court entered November 7, 1990, that remanded the mat-

*State v. Huber,* 129 W.Va. 198, 218, 40 S.E.2d 11, 23 (1946). We have no hesitancy in extrapolating from the language in *Huber* so as to define "judicial function" within the contemplation of the separation of powers provision in article V, section 1 of the West Virginia Constitution as occurring when the courts are open to a hearing on any complaint where powers are exceeded or for any other reason involving legal rights, the solution of which involves the exercise of judicial power.

We recognize that in *In re Application of Metheney,* 182 W.Va. 722, 391 S.E.2d 635 (1990) (*Metheney I* ) we held that the circuit court has discretion to examine the assertions made by applicants to determine if the reasons for obtaining a license are valid and that W.Va.Code 61–7–4 (1989) does not require an applicant to show a "particular, special and compelling need" to carry a concealed weapon.

In a later per curiam opinion in *In re Application of Metheney,* 190 W.Va. 692, 441 S.E.2d 655 (1994) (*Metheney III* ),[14] we appear to have retreated somewhat from that position by holding that given the specific requirements of W.Va.Code 61–7–4 (1995), a circuit court's review of an application cannot go behind the applicant's assertions unless the court has reason to believe, where the facts imply, that the applicant might seek to carry the weapon for an unlawful purpose. This is the type of discretion which we now consider to be symbolic at best and to the extent that *Metheney I* or *Metheney III* are inconsistent with the position expressed today, they are expressly overruled.[15]

ter to the circuit court of Monongalia County "for the purpose of supplementing the record by holding a hearing on the issue of whether there exists a blanket policy in the Circuit Court of Monongalia County of denying permits to carry a concealed deadly weapon," which ultimately evolved into *Metheney III.*

15. While we are expressly overruling *Metheney I* and *Metheney III* to the extent that they are inconsistent with this opinion, we are quick to note that neither *Metheney I* nor *Metheney III* was called upon to address the broad attack on W.Va.Code 61–7–4 (1989) as being in violation of the separation of powers clause of the West Virginia Constitution.

## V.

W.VA.CODE 61–7–4 (1995) IS AN UNLAW-
FUL DELEGATION OF LEGISLA-
TIVE POWER TO THE JUDICIAL
BRANCH OF GOVERNMENT IN VI-
OLATION OF ARTICLE V, SECTION
1 OF THE WEST VIRGINIA CONSTI-
TUTION

We recognize that the jurisprudence of this State requires great deference be shown the Legislature to the extent that what the Legislature has enacted is constitutional. Syllabus Point 1 of *Walter Butler Building Company v. Soto*, 142 W.Va. 616, 97 S.E.2d 275 (1957) states:

When a statute is susceptible of two constructions, one of which is, and the other of which is not, violative of a constitutional provision, the statute will be given that construction which sustains its constitutionality unless it is plain that the other construction is required.

Similarly, Syllabus Point 2 in *Walter Butler Building* provides:

Any doubt as to the constitutionality of an act of the Legislature will always be resolved in favor of the validity of the statute.[16]

Syllabus Point 2, *Walter Butler Building*, 142 W.Va. 616, 97 S.E.2d 275.

■ However, with all due deference, it is axiomatic that the regulation and control of dangerous and deadly weapons is exclusively within the police power of the state exercised through the Legislature and not the Judiciary. In *State ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 467, 377 S.E.2d 139, 149 (1988), we clearly stated that:

[T]he West Virginia legislature may, through the valid exercise of its police power, reasonably regulate the right of a person to keep and bear arms in order to promote the health, safety and welfare of all citizens of this State, provided that the restrictions or regulations imposed do not frustrate the constitutional freedoms guaranteed by article III, section 22 of the West Virginia Constitution, known as the

"Right to Keep and Bear Arms Amendment."

■ W.Va.Code 61–7–4 (1995) is a statutory model of the delegation by the Legislature to the judiciary to perform what can only be described as a legislative function—the act of issuing a license to carry a concealed, deadly weapon. This is the type of relinquishment of legislative function which was condemned in *Hodges v. Public Service Commission* to the extent that "the Legislature cannot commit to the judiciary powers which are primarily legislative." *Hodges v. Public Service Comm'n*, 110 W.Va. 649, 159 S.E. 834 (1931) Again, in *State v. Huber*, we recognize that "it is settled law in this State that the Legislature cannot impose upon any court a duty which requires the performance of an act not judicial in character." *State v. Huber*, 129 W.Va. 198, 214, 40 S.E.2d 11, 21 (1946).

■ As we previously discussed, the reason that the extant statutory scheme does not require the circuit court to perform "an act judicial in character" is that the application for a license to carry a concealed, deadly weapon within W.Va.Code 61–7–4 (1995) presents no case or controversy requiring the Court to exercise its discretion in granting the license.

In other words, the application for a license to carry a concealed, deadly weapon is not: (1) a complaint where powers are exceeded; or (2) a reason involving legal rights, the solution of which involves the exercise of judicial power. *See State v. Huber*, 129 W.Va. at 218, 40 S.E.2d at 23.

■ Accordingly, since: (1) no judicial power is exercised in granting or denying a license to carry a concealed, deadly weapon; and (2) the regulation of the right to carry a concealed, deadly weapon is exclusively a legislative function, then W.Va.Code 61–7–4 (1995) must fail any constitutional litmus test measured against the separation of powers clause of the West Virginia Constitution con-

---

**16.** The validity of the deference doctrine in terms of the constitutionality of a statute has been recently questioned, particularly when the challenge to a statute is based upon the violation of

the separation of powers provision. *See Morrison v. Olson*, 487 U.S. 654, 704, 108 S.Ct. 2597, 2625–26, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting).

340

tained within article V, section 1. This Court has long held that the constitutional jurisdiction of circuit courts extends only to "cases or controversies" that have adversarial character. *See, e.g., Harshbarger v. Gainer,* 184 W.Va. 656, 659, 403 S.E.2d 399, 402 (1991) ("[T]he actual dispute or controversy rule applies to all West Virginia judicial proceedings."); *Mainella v. Bd. of Trustees of Policemen's Pension or Relief Fund,* 126 W.Va. 183, 185–186, 27 S.E.2d 486, 487–488 (1943) ("The pleadings and evidence must present a claim of legal right asserted by one party and denied by the other before jurisdiction of a suit may be taken.").

While we recognize that the doctrine of separation of powers is complex and that some flexibility is required in interpreting this doctrine to meet the realities of contemporary government, we have never hesitated to apply the doctrine where we felt that there was a direct and fundamental relinquishment by one branch of its traditional powers to another branch. *See Appalachian Power Co. v. Public Service Comm'n,* 170 W.Va. 757, 296 S.E.2d 887 (1982).

Despite our holding today, the Legislature is to be commended for their efforts to attempt to impose reasonable regulations on carrying concealed, dangerous weapons, however, in the words of Judge Hatcher in *Hodges v. Public Service Commission:*

This attempt of the legislature to commit one of its great responsibilities to the judiciary is a flattering display of confidence in our department. But we must reject this expansion of our power just as firmly as we should resist a reduction of our rightful authority.

*Hodges v. Public Service Comm'n,* 110 W.Va. 649, 657, 159 S.E. 834, 837 (1931).

During our consideration of the constitutionality of W.Va.Code 61–7–4 (1995), we were concerned as to the statutory schemes enacted by other jurisdictions in terms of the regulation of carrying concealed, deadly weapons. While what other states have done would not be dispositive of the ultimate question under consideration, there is a natural curiosity as to whether or not our sister states enacted similar legislation and, if so, whether it has passed constitutional scrutiny.

Our research has revealed that among the other states that have determined to regulate the carrying and possession of concealed, deadly weapons, twenty have enacted statutory schemes whereby some law enforcement agency is the issuing authority; [17] five have empowered non-law enforcement and non-judicial agencies as the issuing authority; [18] and two have vested the authority in the courts of their states.[19]

---

17. Ala.Code § 13A–11–75 (1975) (sheriff); Alaska Stat. § 18.65.700 (1994) (department of public safety); Ariz.Rev.Stat.Ann. § 13–3112 (1994) (department of public safety); Cal.Penal Code § 12050 (West 1993) (sheriff or chief of police); Colo.Rev.Stat. § 18–12–105.1 (1986) (sheriff or chief of police); D.C.Code Ann. § 22–3206 (1994) (chief of police); Idaho Code § 18–3302 (1994) (sheriff); Ill.Ann.Stat. ch. 430, para. 65/2 (Smith–Hurd 1992); La.Rev.Stat.Ann. § 40:1379.1 (West 1992) (chief law enforcement officer of parish); Md.Crim.Law Code Ann. art. 27, § 36E (1995) (state police); Mich.Comp. Laws § 28.426 (1994) (sheriff, state police or prosecuting attorney); Miss.Code Ann. § 45–9–101 (1991) (department of public safety); Mo. Rev.Stat. § 571.090 (Vernon 1989); Mont.Code Ann. § 45–8–321 (1995) (sheriff); Nev.Rev.Stat. § 202.350 (1995) (sheriff); N.D.Cent.Code § 62.1–04–03 (1995) (chief of bureau of criminal investigation); Okla.Stat. tit. 21, § 1290.12 (1995) (state bureau of investigation); Or.Rev. Stat. § 166.291 (1993) (sheriff); 18 Pa.Cons.Stat. § 6109 (1988) (sheriff); Utah Code Ann. § 53–5–704 (1995) (department of public safety).

18. Fla.Stat. ch. 790.06 (1993) (department of State); Me.Rev.Stat.Ann. tit. 25, § 2003 (West 1993) (city official or chief of police); R.I. Gen. Laws § 11–47–11 (1994) (police); S.D.Codified Laws Ann. § 23–7–8 (1985) (secretary of state); Wyo.Stat. § 6–8–104 (1995) (attorney general).

19. Del.Code Ann. tit. 11, § 1441 (1990) (superior court); Wash.Rev.Code § 9.41.070 (1985) (judge of a court of record, chief of police or sheriff).

Of the states that have vested the courts with the authority to issue a license to carry concealed, deadly weapons, our research has not disclosed any constitutional challenge on the grounds of the validity of that statute within the separation of powers doctrine. Of particular interest, however, is the statutory scheme enacted by the State of Delaware relating to the licensing to carry concealed, deadly weapons within the context of a right to bear arms constitutional provisions, which is virtually identical to West Virginia. Delaware's constitution provides:

A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use.

■ Finally, article 7 of chapter 61 contains no provision specifying that the various sections within that article are not to be severable nor does that article have its own savings clause. Accordingly, under the general savings provision contained in W.Va. Code 2–2–10(cc) (1989),[20] we hold that the remaining sections of article 7, chapter 61 shall remain valid and in full force and effect. Until such time as the Legislature chooses to exercise its prerogative and enacts another statute designed to provide the statutory scheme for the carrying of a concealed, deadly weapon, the provisions of W.Va.Code 61–7–3 (1989) shall continue to proscribe the carrying of a concealed, deadly weapon without a state license or other authorization.

## VI.
## PROSPECTIVE APPLICATION OF DECISION

While we have no reluctance to invalidate W.Va.Code 61–7–4 (1995) for the reasons we have stated, we are not unmindful of the impact which this decision might have upon those licenses which have been previously granted pursuant to this statute.

If we were to extend full retroactivity of this decision, the effect on extant licenses would be to deprive a person of a license which they thought they had the right to obtain by conforming to all of the requirements of what the Legislature said to do. Such a result would not only be unfair but would create chaos within the law enforcement community in terms of determining whether or not a person has a valid license, particularly within the meaning of W.Va. Code 61–7–3 (1995) which proscribes the carrying of a concealed, deadly weapon without a State license or other lawful authorization.[21]

This Court has formulated its own test in determining whether to extend full retroactivity in civil cases as set forth in Syllabus Point 5 in *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979).[22]

Del. Const. art. I, § 20. The only distinction between the West Virginia Amendment and the Delaware constitutional provision is the addition of the word "lawful" modifying hunting and recreational use.

Attention is directed to the statutory scheme in Delaware, whereby an applicant for a license to carry a concealed, deadly weapon is required to provide notice of the filing of the application and after a screening process through the prothonotary's office, the court "may or may not, in its discretion, approve any application, and, in order to satisfy the Judges thereof fully in regard to the propriety of approving the same, may receive remonstrances and hear evidence and arguments for and against the same, and establish general rules for that purpose." Del.Code Ann. tit. 11, § 1441(d) (1990). This statutory scheme provides some of the types of "judicial power" that is contemplated within *State v. Huber*, 129 W.Va. 198, 40 S.E.2d 11 (1946).

**20.** W.Va.Code 2–2–10(cc) (1989) states:

Unless there is a provision in a section, article or chapter of this code specifying that the provisions thereof shall not be severable, the provisions of every section, article or chapter of this code, whether enacted before or subsequent to the effective date of this subdivision [March 30, 1973], shall be severable so that if any provision of any such section, article or chapter is held to be unconstitutional or void, the remaining provisions of such section, article or chapter shall remain valid, unless the court finds the valid provisions are so essentially and inseparably connected with, and so

dependent upon, the unconstitutional or void provision that the court cannot presume the Legislature would have enacted the remaining valid provisions without the unconstitutional or void one, or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent: Provided, That if any such section, article or chapter of this code has its own severability clause, then such severability clause shall govern and control with respect to such section, article or chapter in lieu of the provisions of this subdivision. *The provisions of this subdivision shall be fully applicable to all future amendments or additions to this code, with like effect as if the provisions of this subdivision were set forth in extenso in every such amendment or addition and were reenacted as a part thereof, unless such amendment or addition contains its own severability clause.*

**21.** Pursuant to W.Va.Code 61–7–4(f) (1995), after a license is granted, the clerk of the circuit court is required to furnish the superintendent of the Department of Public Safety a certified copy of the order granting the license. Further, it is the duty of the clerk of the circuit court to furnish the superintendent of the Department of Public Safety at any time so requested, a certified list of all such licenses issued in the county.

**22.** Syllabus Point 5, *Bradley v. Appalachian Power Company*, 163 W.Va. 332, 256 S.E.2d 879 (1979) states:

Among the six factors to be considered as established in *Bradley* is when "substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored." Syllabus Point 5, *Bradley*, 163 W.Va. 332, 256 S.E.2d 879.

■ While this decision does not represent a clear departure from prior precedent in terms of separation of powers jurisprudence, it does represent the first occasion that we have examined this particular licensing statute using separation of powers standards. Accordingly, since substantial public issues are involved arising from a constitutional interpretation of a statute on first impression, this decision shall apply prospectively and shall not impair or impact upon any license previously granted under W.Va.Code 61–7–4 (1995).

Certified Question Answered.

WORKMAN, J., concurs, and reserves the right to file a concurring opinion.

ALBRIGHT, J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

WORKMAN, Justice, concurring:

(Filed Nov. 22, 1995).

I concur with the majority but write separately primarily to clarify that nothing in our opinion precludes the Legislature from expanding on the requirements of the law for a license to carry a concealed weapon, and to urge the Legislature, when it crafts new legislation governing concealed weapon permits, to create reasonable conditions for such a permit.

While this Court held in *State ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 377 S.E.2d 139 (1988), that "the statutory proscription against carrying a dangerous or deadly weapon is overbroad and violative of article III, section 22 of the *West Virginia Constitution* . . . ," clearly nothing in our constitution entitles one as a matter of right to carry a *concealed* weapon. 180 W.Va. at 458, 377 S.E.2d at 140. This fact is quite clearly substantiated in a three page legal memorandum on the proposed constitutional amendment, prepared by an attorney for the National Rifle Association ("NRA") and sent to all members of the West Virginia Legislature prior to the amendment's 1986 enactment, wherein the NRA recognized that "[t]he bearing of constitutionally protected arms may be regulated. Concealed carrying statutes, e.g., are routinely upheld." "Analysis of Proposed West Virginia Constitutional Guarantee to Keep and Bear Arms," reprinted in James W. Neely, *The Right of Who to Bear What, When, and Where—West Virginia Firearms Law v. The Right-to Bear–Arms Amendment*, 89 W.Va.L.Rev. 1125, 1176 (1987); see Stephen P. Halbrook, *Rationing Firearms Purchases and the Right to Keep Arms: Reflections on the Bills of Rights of Virginia, West Virginia and the United States*, 96 W.Va.L.Rev. 1, 68–69 (1993).

Generally,
[c]oncealed weapon permits are issued based on a variety of criteria, such as: (1) the objective or subjective (or both) personal qualifications of the individual; (2) background investigations; (3) fingerprint checks for criminal information; and (4)

In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law *decisions*, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions.

safety training courses or qualification to use a weapon.

Richard Getchell, Comment, *Carrying Concealed Weapons in Self–Defense: Florida Adopts Uniform Regulations for the Issuance of Concealed Weapons Permits,* 15 Fla. St.U.L.Rev. 751, 757 (1987). Consequently, in establishing the new legislation regarding concealed weapons permits, hopefully the Legislature will look to other state statutes which combine not only certain objective and subjective requirements, but interject other reasonable conditions as a prerequisite to obtaining the necessary permit. For instance, as the majority noted in footnote 19, *supra,* the Delaware Legislature not only requires a person to establish certain subjective and objective elements of age, sobriety, good moral character, and a reputation for peacefulness in the community before a concealed weapons permit can be issued, but also provides that "the court 'may or may not, in its discretion, approve any application and, in order to satisfy the Judges thereof fully in regard to the propriety of approving the same, may receive remonstrances and hear evidence and arguments for and against the same, and establish general rules for that purpose.' " Del.Code Ann. tit. 11, § 1441(a) and (d) (1990).

I reiterate the same concern I expressed in a dissenting opinion to *In re Application of Metheney,* 190 W.Va. 692, 441 S.E.2d 655 (1994), does "the state legislature really intend[ ] for almost everyone to have the right to carry a concealed handgun[?]" *Id.* at 694, 441 S.E.2d at 657. If this is not the Legislature's intention, then it should clearly indicate that by the enactment of a statute which contains reasonable requirements limiting concealed weapon permits.

Should the Legislature enact such requirements thereby creating "an act judicial in character," the issuance of concealed weapon permits could then be returned to the courts or could be placed in an administrative agency of state government. *See State v. Huber,* 129 W.Va. 198, 214, 40 S.E.2d 11, 21 (1946). Who the Legislature directs to oversee this process (the judicial or executive branch) is immaterial. The more significant concern is the enactment of reasonable conditions, and

hopefully a requirement that a person seeking a concealed weapon permits articulate a legitimate *need* for the permit before it is issued.