595 S.E.2d 289

**STATE of West Virginia, Plaintiff below, Appellee,**

v.

**Tony Dean ARBAUGH, Jr., Defendant below, Appellant.**

No. 31326.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 10, 2004.

Decided March 2, 2004.

Concurring Opinion of Justice Albright March 5, 2004.

Concurring and Dissenting Opinion by Justice Starcher March 31, 2004.

Dissenting Opinion by Chief Justice Maynard April 7, 2004.

Davis, J., dissented and filed opinion, in which Maynard, C.J., joined.

Albright, J., concurred and filed opinion, in which Starcher and McGraw, JJ., joined.

Starcher, J., concurred in part, dissented in part, and filed opinion.

Maynard, C.J., dissented and filed opinion.

**133**

Amanda H. See, See & See, Moorefield, Counsel for Appellant.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, Counsel for Appellee.

Chief Justice MAYNARD and Justice DAVIS dissent and reserve the right to file dissenting opinions.

Justice ALBRIGHT concurs and reserves the right to file a concurring opinion.

PER CURIAM.

Tony Dean Arbaugh, Jr. (hereinafter "Mr. Arbaugh") appeals the denial of his W. Va. R. Crim P. 35(b) motion by the Circuit Court of Pendleton County, West Virginia. In this motion, he requested a reduction in sentence in the nature of a grant of probation so that he could pursue a rehabilitation program under the auspices of Youth System Services, Inc. Having read the briefs, reviewed the record, and heard oral argument, we reverse and remand with directions to the circuit court to grant Mr. Arbaugh probation to follow his proposed rehabilitation plan. We further direct that the rehabilitation plan proposed by Mr. Arbaugh should include specific provisions that Mr. Arbaugh undergo both sexual offender counseling and substance abuse counseling.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The appellant in this case, Mr. Arbaugh, has led a long and painful life. He endured a long history of sexual assault at the hands of two of his adult male family members, begin-

ning when he was seven or eight years old. These assaults included oral sex, sodomy, mutual masturbation, and "dry humping." Mr. Arbaugh was also sexually assaulted by one of his teachers for a period of four years. *Arbaugh v. Board of Educ.*, 214 W.Va. 677, 680, 591 S.E.2d 235, 238 (2003). As a result of these attacks, Mr. Arbaugh began acting out sexually against his younger half brother.[1] As a result of this conduct, a delinquency petition was filed on February 28, 1997, when Mr. Arbaugh was fifteen years old.[2] After a hearing, Mr. Arbaugh was transferred to adult jurisdiction on April 7, 1997. On June 25, 1997, he waived his right to grand jury indictment and accepted the filing of an information charging him with first degree sexual assault. On this same day, he pled guilty under the information to one count of first degree sexual assault. In exchange for this plea, the State dropped an additional nine counts of first degree sexual assault and agreed not to oppose Mr. Arbaugh's placement in a non-secure facility and disposition under W. Va.Code § 49–5–13(e) (2001 Repl.Vol.).[3] The State also agreed that, if he did not present a security risk or create any further problems, it would recommend placement in a youthful offender center upon his 18th birthday.

On September 4, 1997, the court sentenced Mr. Arbaugh to an indeterminate term of fifteen to thirty-five years and restitution. The court, however, suspended sentence due to Mr. Arbaugh's age and his enrollment in the Chestnut Ridge Treatment Center. The court ordered that, once finished at Chestnut Ridge, Mr. Arbaugh was to reside in a secure juvenile facility. The court ordered sentence reevaluation when Mr. Arbaugh turned eighteen.

On August 20, 1998, the court placed Mr. Arbaugh in a group home run by Stepping Stones, Inc. Unfortunately, Mr. Arbaugh's behavior digressed while at Stepping Stones. Therefore, the State filed a motion to reconsider disposition. The circuit court transferred Mr. Arbaugh to the Eastern Regional Juvenile Facility.

After he turned eighteen, the circuit court transferred Mr. Arbaugh to the Anthony Center under the Youthful Offender Act, W. Va.Code §§ 25–4–1 to –12 (Repl.Vol.2001) The court said it would review the sentence when Mr. Arbaugh was released from the youthful offender program.

After Mr. Arbaugh successfully completed the youthful offender program, the court placed him on five years probation. The probation terms required, *inter alia*, adherence to all the probation officer's rules and regulations, that he not violate any laws nor have any alcohol or drugs, and that he obtain counseling.

On December 11, 2000, the State petitioned to revoke probation. At the revocation hearing, Mr. Arbaugh admitted to having used marijuana and alcohol, failing to obtain on-going counseling, and failing to pay his five dollar a month probation fee. Based on these violations, and several other violations, the court revoked probation.

On February 1, 2001, Mr. Arbaugh timely filed a motion under W. Va. R. Crim P. 35(b) to reduce his sentence by granting him probation to pursue another rehabilitation program.[4] At the Rule 35(b) hearing, Mr. Arbaugh presented the testimony of Paul Flanagan, who works for Youth Systems Services (hereinafter "YSS"). Mr. Flanagan is a graduate of the Criminal Justice Police in the United Kingdom and is a volunteer with the Marist Brothers, a Roman Catholic religious community. Mr. Flanagan explained that YSS is a unique consulting pro-

---

1. We note that at least during some of the time that Mr. Arbaugh was abusing his brother, the two of them were supposed to be in the custody of the Department of Health and Human Resources, but that the Department did not know where the two children were located.

2. While Mr. Arbaugh was 15 when the petition was filed, the petition covered conduct of Mr. Arbaugh from when he turned 14.

3. W. Va.Code § 49–5–13(e) permits a circuit court to make a disposition of a juvenile transferred to adult jurisdiction under the juvenile proceedings act.

4. Rule 35(b) provides in pertinent part that "[c]hanging a sentence from a sentence of incarceration to a grant of probation shall constitute a permissible reduction of sentence under this subdivision."

gram that for the last thirty years has worked with over 16,000 youngsters and averaging 600 annually. YSS has won many national awards and is one of only six private detention facilities in the United States. Mr. Flanagan explained that YSS was not asking to be paid for this program for Mr. Arbaugh, but chose to do it because they believed that Mr. Arbaugh "can be saved and can be brought around to a pro-social life. The pro-social adult to serve in the community."

Mr. Flanagan explained that Mr. Arbaugh's YSS program would consist of removing him from the Eastern Panhandle to the Northern Panhandle so as to remove him from the influences that initially caused his conduct. Mr. Arbaugh would reside in community apartments coupled with a variety of skill development programs so as to prepare him for independent living. He would be employed as a janitor at a local Catholic high school, and would work under the supervision of Brother Dan O'Riordian. Mr. Arbaugh would also be provided supportive services through the Marist Brothers and would have access to designated YSS staff "24/7" for crisis situations. YSS would provide the circuit court with any required reports. Notwithstanding the fact that Mr. Arbaugh had a rehabilitation program in place (that would not cost the State any money), the circuit court denied Mr. Arbaugh's Rule 35(b) motion explaining that Mr. Arbaugh had been

> provided everything that the Court was aware of before and the Court has showed him mercy before and is very sympathetic to his situation, but nonetheless feels that also the Court has an obligation to the public and because of that the Court is not going to—to grant his relief request.

It is from this order Mr. Arbaugh seeks appellate relief.

**5.** We recognize that Mr. Arbaugh has raised several other issues in his brief. However, we find these other issues "are meritless, were not preserved at trial or are not properly briefed in this Court. Thus, we decline to address them." *State v. Varner,* 212 W.Va. 532, 536 n. 4, 575 S.E.2d 142, 146 n. 4 (2002) (per curiam).

**6.** We also note that the State asserts in a footnote in its brief that Mr. Arbaugh waived the denial of his Rule 35(b) by failing to raise it in his petition

## II.

### STANDARD OF REVIEW

The standard of review in this case is found in syllabus point 1 of *State v. Head,* 198 W.Va. 298, 480 S.E.2d 507 (1996):

> In reviewing the findings of fact and conclusions of law of a circuit court concerning an order on a motion made under Rule 35 of the West Virginia Rules of Criminal Procedure, we apply a three-pronged standard of review. We review the decision on the Rule 35 motion under an abuse of discretion standard; the underlying facts are reviewed under a clearly erroneous standard; and questions of law and interpretations of statutes and rules are subject to a *de novo* review.

## III.

### DISCUSSION

Mr. Arbaugh argues that the circuit court abused its discretion in failing to grant his Rule 35(b) motion to reduce his sentence to probation.[5] The State counters that the Youthful Offender Act mandates that once an original probation is revoked then a circuit court is without jurisdiction to again grant probation and is obligated to execute the sentence. It alternatively argues that the circuit court did not abuse its discretion in granting probation given Mr. Arbaugh's past rehabilitation programs. We find that the circuit court abused its discretion.[6]

We first reject the proposition that the Youthful Offender Act, W. Va.Code §§ 25-4-1 to 12, prohibits a circuit court from granting probation under Rule 35(b) after it has revoked a probation it originally granted under the Act. The State cites W. Va.Code § 25-4-6's language that upon suc-

for appeal. However, the State cites us no authority or even argument for this position; thus, we decline to address it. *See, e.g., State v. LaRock,* 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal.").

cessful completion of the youthful offender program, "the court shall immediately place the offender on probation. In the event the offender's probation is subsequently revoked, the judge shall impose the sentence the young adult offender would have originally received had the offender not been committed to the center and subsequently placed on probation." The State asserts that the language "shall impose the sentence" to support the claim that the legislature's intent was to prevent any subsequent probation once the original Youthful Offender Act probation is revoked. We must disagree with the State.

Even assuming the State is correct in its reading of W. Va.Code § 25-4-6, we have long recognized that our judicially promulgated rules of practice are constitutionally based and supersede any conflicting statutory provisions. As we held in syllabus point 1 of *Bennett v. Warner*, 179 W.Va. 742, 372 S.E.2d 920 (1988), "[u]nder article eight, section three of our Constitution, the Supreme Court of Appeals shall have the power to promulgate rules for all of the courts of the State related to process, practice, and procedure, which shall have the force and effect of law." We have more recently and more specifically held, "[t]he West Virginia Rules of Criminal Procedure are the paramount authority controlling criminal proceedings before the circuit courts of this jurisdiction; any statutory or common-law procedural rule that conflicts with these Rules is presumptively without force or effect." Syl. pt. 5, *State v. Wallace*, 205 W.Va. 155, 517 S.E.2d 20 (1999). Therefore, we find the State's argument in this regard without merit. Consequently, we turn now to whether or not the circuit court abused its discretion under Rule 35(b).

The circuit court refused to grant Mr. Arbaugh probation because Mr. Arbaugh had been

> provided everything that the Court was aware of before and the Court has showed him mercy before and is very sympathetic to his situation, but nonetheless feels that also the Court has an obligation to the public and because of that the Court is not going to—to grant his relief request.

While we appreciate the circuit court's concerns, we cannot agree with them. There is no evidence in the record that Mr. Arbaugh was a sexual threat to anyone. None of his alleged probation violations indicated that he was a sexual threat to the community, and we cannot find under the facts of this case that simply based on his past acts that Mr. Arbaugh is a future threat. *See State v. Sapps*, 820 A.2d 477, 501 n. 82 (Del.Fam.Ct.2002) (citing Sue Righthand & Carlann Welch, *Juveniles Who Have Sexually Offended: A Review of the Professional Literature* 30–31 (U.S. Dep't of Justice, Office of Juvenile Justice and Delinquency Prevention 2001)) ("[S]uggesting that once a juvenile's sex offending has been officially recognized, subsequent detected sexual recidivism is relatively infrequent. Also, stating that some studies to date reflect that very few who commit sex offenses as juveniles go on to commit such offenses as young adults.").

The most serious of his probation violations was the use of alcohol and marijuana. While we do not condone these acts, we cannot turn a blind eye to the heinous atrocities perpetrated upon Mr. Arbaugh. He suffered numerous sexual assaults committed against him while he was only seven or eight years old. These assaults continued over a period of at least six or seven years, and were committed by at least two relatives and a teacher. Although these assaults were known to his family, they did nothing to intervene on his behalf. We cannot ignore that Mr. Arbaugh was a juvenile who was himself the victim of prolonged and extensive sexual assault when he acted out against his step-brother. Finally, we cannot ignore that at least some of Mr. Arbaugh's assaults on his brother occurred when they were supposed to be in the custody of the Department of Health and Human Resources (hereinafter "DHHR"), although the two brothers had run away and DHHR was unaware of their whereabouts.

"We have stated that 'the law treats juveniles differently than others. "From the earliest time infants were regarded as entitled to special protection from the State." ' " *State ex rel. Garden State Newspapers, Inc.*,

*v. Hoke,* 205 W.Va. 611, 618, 520 S.E.2d 186, 193 (1999) (quoting *Ogden Newspapers, Inc. v. City of Williamstown,* 192 W.Va. 648, 654, 453 S.E.2d 631, 637 (1994)) (quoting *State v. Boles,* 147 W.Va. 674, 678, 130 S.E.2d 192, 195 (1963)). We have also articulated the duty we as a Court have to those society might chose to forget or ignore, " '[p]risoners are no one's constituents and weld little, if any, political clout. Consequently, society frequently forgets about, or even ignores these people, its unfortunate charges. It is therefore incumbent upon this Court ever to be vigilant in the protection of their legal rights.' " *State ex rel. Riley v. Rudloff,* 212 W.Va. 767, 779, 575 S.E.2d 377, 389 (2002) (quoting *Ray v. McCoy,* 174 W.Va. 1, 4, 321 S.E.2d 90, 93 (1984)).

We agree with the State that Mr. Arbaugh's rehabilitation has not been without its bumps, but "[g]iven [his] serious needs, the implicit expectation that he would respond instantly to treatment … shows a … lack of understanding or appreciation for either trauma or adolescent psychology." *United States v. Juvenile,* 347 F.3d 778, 789 (9th Cir.2003). Considering Mr. Arbaugh's tender age and extreme victimization, we cannot, we will not, surrender any opportunity to salvage his life and to turn him into a productive member of society. *See id.* at 778–89 (citation omitted) ("[T]he [Trial] Court … failed to consider [the appellant's] own history of victimization[.]") Indeed, as Justice Cleckley notes in his concurring opinion in *State v. Head,* 198 W.Va. 298, 306, 480 S.E.2d 507, 515 (1996) (Cleckley, J., concurring) (citation omitted), "I believe that the only way a circuit court can abuse his discretion on a Rule 35(b) motion is to commit a legal error, or that its ruling was marred by a fundamental defect which inherently results in a miscarriage of justice." We can conceive of no greater miscarriage of justice than subjecting Mr. Arbaugh under the facts of this case to a term of imprisonment without affording him every opportunity to rehabilitate himself. "Compassion is still an element of the law. The quality of mercy should not be strained on the facts before us." *People v. Monday,* 70 Mich.App. 518, 523, 245 N.W.2d 811, 814 (1976).

Given that Mr. Arbaugh's motion for probation was supported by a rehabilitation plan which has won national acclaim, we must conclude that the circuit court abused its discretion in not granting Mr. Arbaugh probation to follow this program. However, we also wish to note that given the circuit court's obvious concern with Mr. Arbaugh's marijuana use, that the YSS plan should be amended to specifically include a substance abuse counseling plan as well as a sexual offender counseling plan. Thus, we direct the circuit court to grant Mr. Arbaugh probation to follow the YSS rehabilitation plan. We further direct that the YSS plan should include specific provisions that Mr. Arbaugh undergo both sexual offender counseling and drug and alcohol abuse counseling.

## IV.

### CONCLUSION

The judgment of the Circuit Court of Pendleton County is reversed and remanded with directions.

Reversed and remanded with directions.

DAVIS, J., dissenting, joined by Chief Justice MAYNARD.

The majority finds that the circuit court abused its discretion in denying Mr. Arbaugh's Rule 35(b) motion for another probation period. To do so, the majority eviscerates the law to effectuate its own personal view of a proper outcome in this case. This is a dangerous precedent. I dissent because "[i]t is the unpopular or beleaguered individual—not the [individual] in power—who has the greatest stake in the integrity of the law." *Florida Dep't of Health and Rehab. Serv. v. Florida Nursing Home Ass'n,* 450 U.S. 147, 154, 101 S.Ct. 1032, 1036–37, 67 L.Ed.2d 132, 139 (per curiam) (footnotes omitted) (Stevens, J., concurring).

### A. The Youthful Offender Act and Rule 35(b).

In this case, the State asserts that the Youthful Offender Act's probation section, W. Va.Code § 25–4–6, denies a circuit court the discretion to reduce a sentence by awarding a second period of probation if the original

probation under the Act has been revoked.[1] In this regard the State is absolutely right for we have held:

> Where a criminal defendant has been placed on probation after successfully completing a program of rehabilitation under the Youthful Offenders Act, W. Va.Code §§ 25–4–1 to –12, and such probation is subsequently revoked, the circuit court has no discretion under W. Va.Code § 25–4–6 to impose anything other than the sentence that the defendant would have originally received had he or she not been committed to a youthful offender center and subsequently placed on probation.

Syl. pt. 4, *State v. Richards,* 206 W.Va. 573, 526 S.E.2d 539 (1999). *Accord* Syl., *State v. Patterson,* 170 W.Va. 721, 296 S.E.2d 684 (1982) ("W. Va.Code, 25–4–6, does not allow a trial court discretion to impose any less than the original sentence when a male defendant, who has served at a youth correctional facility, violates his probation agreement."); *see also* Syl., *State v. Martin,* 196 W.Va. 376, 472 S.E.2d 822 (1996) (per curiam) (same). However, the majority finds its way around both the plain language of the Youthful Offender Act, as well as our interpretation of it, by concluding that Rule 35(b)'s probation provision trumps the Youthful Offender Act by virtue of our constitutional rule-making power. This finding is unsupported by the plain language of our Constitution and by case law. Thus, the majority usurps the legislature's power to determine the conditions upon which probation may and may not be awarded.

The majority finds that our constitutional rule making authority gives us the power to trump the Youthful Offender Act. Our Constitution does not bear such a reading. Article VIII, § 3 of the West Virginia Constitution grants us the power to promulgate rules "for all cases and proceedings, civil and criminal, for all the courts of the State relating to writs, warrants, process, practice, and procedure, which shall have the force and effect of law." Article VIII, § 3 prohibits the legislature from interfering with our procedural rules, it does not authorize us to make substantive law-that power still residing in the legislature under W. Va. Const. Art. VI, § 1. *See United States v. Sherwood,* 312 U.S. 584, 589–90, 61 S.Ct. 767, 771, 85 L.Ed. 1058, 1063 (1941) ("An authority conferred upon a court to make rules of procedure for the exercise of its jurisdiction is not an authority to enlarge that jurisdiction[.]")

This recognition leads to the conclusion that "a statute governing *procedural* matters in criminal cases which conflicts with a rule promulgated by the Supreme Court would be a legislative invasion of the court's rule-making powers. Conversely, in *substantive* matters, a statutory enactment of the legislative branch prevails over a conflicting Supreme Court rule." *People v. Hollis,* 670 P.2d 441, 442 (Colo.Ct.App.1983) (citations omitted). *See also In re Daniel H.,* 133 N.M. 630, 634, 68 P.3d 176, 180 (Ct.App.2003) (recognizing "the established notion that the separation of powers doctrine precludes the legislature from stepping into the judiciary's exclusive domain of prescribing the rules of judicial practice and procedure and similarly precludes the judiciary from overturning or contradicting a constitutional legislative declaration of substantive law.") In other words,

> [i]n order to ascertain whether there is an infringement on this Court's rulemaking authority, we must first determine whether the statute is substantive or procedural. If we find that the statute is 'substantive and that it operates in an area of legitimate legislative concern,' then we are precluded from finding it unconstitutional.

*Caple v. Tuttle's Design–Build, Inc.,* 753 So.2d 49, 53 (Fla.2000).

---

1. This issue was not raised below. However, "courts cannot set punishments that are inconsistent with statutory penalties." *Spencer v. Whyte,* 167 W.Va. 772, 775, 280 S.E.2d 591, 593 (1981), *superseded by statute on other grounds as stated in State v. White,* 188 W.Va. 534, 425 S.E.2d 210 (1992). If a circuit court exceeds its statutory authority in sentencing, it perforce exceeds its jurisdiction. Subject-matter jurisdiction is never waived, *State ex rel. Barden and Robeson Corp. v. Hill,* 208 W.Va. 163, 168, 539 S.E.2d 106, 111 (2000), and, like here, may be raised for the first time on appeal. *Easterling v. American Optical Corp.,* 207 W.Va. 123, 132, 529 S.E.2d 588, 597 (2000).

The distinction between substantive and procedural law may sometimes be subtle. However, it may generally be said that

> "Substantive law prescribes norms for societal conduct and punishments for violations thereof. It thus creates, defines, and regulates primary rights. In contrast, practice and procedure pertain to the essentially mechanical operations of the courts by which substantive law, rights, and remedies are effectuated."

*State v. Templeton,* 148 Wash.2d 193, 213, 59 P.3d 632, 642 (2002) (quoting *State v. Smith,* 84 Wash.2d 498, 501, 527 P.2d 674, 677 (1974)). *See also Opinion of the Justices,* 141 N.H. 562, 572, 688 A.2d 1006, 1012–13 (1997); *State ex rel. Higginson v. United States (In re SRBA Case No. 39576 ),* 128 Idaho 246, 255, 912 P.2d 614, 623 (1995); *Haven Fed. Savings & Loan, Inc. v. Kirian,* 579 So.2d 730, 732 (Fla.1991). An analysis of West Virginia law shows that statutes defining the conditions of probation are substantive and not procedural.

We have consistently held that "the substantive power to prescribe crimes and determine punishments is vested with the legislature[.]" *State v. Gill,* 187 W.Va. 136, 141, 416 S.E.2d 253, 258 (1992) (citations omitted). Because we recognize the legislature's power to define crimes and determine punishments, we have likewise held that "we consider the right to determine the conditions under which a sentence can be suspended and a person placed on probation to be a legislative prerogative. Probation is inextricably tied to the setting of punishment, which is the legislature's domain." *Spencer v. Whyte,* 167 W.Va. 772, 775, 280 S.E.2d 591, 593 (1981), *superseded by statute on other grounds as stated in State v. White,* 188 W.Va. 534, 425 S.E.2d 210 (1992). *Accord id.,* Syl. pt. 1 ("The right to probation was a legislative prerogative since courts did not possess the inherent power to grant probation."); *State ex rel. Atkinson v. Wilson,* 175 W.Va. 352, 354, 332

S.E.2d 807, 809 (1984) (similar). *See also State ex rel. Goff v. Merrifield,* 191 W.Va. 473, 480, 446 S.E.2d 695, 702 (1994) (footnote omitted) ("[P]robation ... is a legislative prerogative").

Clearly, the legislature's substantive constitutional power to define crimes and enact punishments includes the substantive power to determine the conditions under which probation will not be permitted-and this is exactly what the legislature did in W. Va.Code § 25–4–6, and this is exactly what we have previously held the legislature did in W. Va. Code § 25–4–6. *See* Syl. pt. 4, *Richards;* Syl., *Patterson;* Syl. *Martin.* If a grant of probation under Rule 35(b) is a "reduction in sentence," then W. Va.Code § 25–4–6 renders such a reduction/probation impermissible.[2]

Through today's decision, the majority has arrogated to itself the substantive power to define under what conditions probation may be awarded, even if the awarding of such probation violates the plain language of a statute. The majority would do well to remember that "accumulation of power in the same departments, ... is the 'very definition of tyranny[.]' " *In re Dailey,* 195 W.Va. 330, 332, 465 S.E.2d 601, 603 (1995) (quoting *The Federalist* No. 47, at 329 (James Madison) (1917)).

### B. The majority has ignored important facts.

I must also point out that even if Rule 35(b) controls this case, the majority has reached an insupportable conclusion under this Rule. I begin this issue by acknowledging that the majority's facts are, as far as they go, accurate. However, to paraphrase Mark Twain, " '[o]ften, the surest way to convey misinformation is to tell the strict truth[.]' " *Quoted in United States v. Dean,* 55 F.3d 640, 662 (D.C.Cir.1995).

Mr. Arbaugh not only repeatedly raped his younger half-brother from August 1, 1995,

---

**2.** There is also a non-constitutional reason to find that Rule 35(b) does not alter the legislature's substantive power to enact conditions justifying or denying probation. The West Virginia Rules of Criminal Procedure are "are almost identical to the Federal Rules of Criminal Procedure[.]" *State v. Simmons,* 172 W.Va. 590, 594

n. 1, 309 S.E.2d 89, 93 n. 1 (1983). Being patterned on the federal rules, our state rules have imported the limitation of the federal rules, found in the Federal Rules Enabling Act, that the rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b) (2000).

through April 22, 1996, but he also sexually assaulted a number of other victims ranging in age from four to thirteen, including two brothers, two sisters, two peers, two nephews and two cousins. Mr. Arbaugh would ask his victims to participate and lull them into a false sense of security that he would not harm them. He at times used bribes and force to commit his sexual offenses. He offended both when he was sober and intoxicated. When confronted with his actions, Mr. Arbaugh stated "'that's what people [do]."' Chestnut Ridge identified that Mr. Arbaugh has several high risk factors for re-offending, including substance abuse. While at Chestnut Ridge, Mr. Arbaugh was allowed to take a home visit and upon return tested positive for marijuana and cocaine.

Mr. Arbaugh's troubles did not end at Chestnut Ridge. On August 20, 1998, the court placed Mr. Arbaugh in a group home run by Stepping Stones, Inc. While starting out positively, he became "very non-compliant and overtly disobedient" around April and May of 1999. He sought money from other residents to buy "a supply of roaches," a term the staff thought referred to marijuana. He became "extremely enraged" during a search of his room to locate possible contraband. He was verbally aggressive toward staff, and slammed his hand on a table several times. After an empty pack of cigarettes was discovered in his room, he was grounded for three days. He refused to obey the rules of this sanction. He also refused a drug and alcohol test, but admitted to frequent marijuana use. He resisted information about the negative consequences of such drug use, indicating that he saw nothing wrong with it. Mr. Arbaugh incited other residents to misbehave, and physically defaced Stepping Stones' property. Stepping Stones admitted it could no longer handle him. Even in light of all of this, the circuit court yet again afforded Mr. Arbaugh an opportunity to avoid prison, by transferring him to Anthony Center.

After he successfully completed the youthful offender program, the court placed Mr. Arbaugh on five years probation in August 2000. The probation required him to, *inter alia*, adhere to all the probation officer's rules and regulations, abstain from alcohol and drugs, and obtain counseling at least once a month. On December 11, 2000, the State petitioned to revoke probation. At the revocation hearing, Mr. Arbaugh admitted to having used marijuana and alcohol, failing to obtain on-going counseling, and failing to pay his probation fee. The circuit court also found that Mr. Arbaugh violated almost all the remaining probation requirements. The court only then revoked probation. Having now recited the factual backdrop, I turn to the flaws in the majority's application of Rule 35(b).

## C. The circuit court did not abuse its discretion by declining Mr. Arbaugh another opportunity to participate in rehabilitation.

The majority properly cites syllabus point 1 of *State v. Head*, 198 W.Va. 298, 480 S.E.2d 507 (1996), as governing this case and properly cites the abuse of discretion prong as being the controlling aspect for our decision. The majority then, however, completely ignores the limited nature of our review under an abuse of discretion standard. Abuse of discretion review does not allow us to "substitute our judgment for the circuit court's." *See State v. Taylor*, 215 W.Va. 74, 83, 593 S.E.2d 645, 654 (2004) (citations omitted). More specifically "[s]ince the Rule 35 motion is directed to the sound discretion of the court, the denial of the motion is to be reviewed so as to determine whether the denial was an abuse of discretion. The appellate court cannot replace its judgment of the facts for that of the circuit court." 5 Mark S. Rhodes, *Criminal Procedure under the Federal Rules* § 35:38 at 480 (1987) (footnote omitted).

Replacing its judgment for that of the circuit court, however, is exactly what the majority has done. As Justice Cleckley elaborated:

It is not our role to undermine the valid exercise of constrained discretionary authority by circuit courts, when they have imposed sentences that fall that fall [sic] legitimately within the four corners of our federal and state constitutions, applicable statutory provisions and our criminal procedure rules. Circuit court judges have a

right to believe that so long as they have not violated a law or acted in a nefariously discriminatory way in imposing sentences, this Court will not sift through the nooks and crannies of their decisions determined on finding that which is not there.

198 W.Va. at 306, 480 S.E.2d at 515.[3]

The majority correctly observes " 'that the only way a circuit court can abuse his discretion on a Rule 35(b) motion is to commit a legal error, or that its ruling was marred by a fundamental defect which inherently results in a miscarriage of justice.' " *Head,* 198 W.Va. at 306, 480 S.E.2d at 515 (citation omitted). However, the majority then proceeds to distort the second arm of this test by concluding "[w]e can conceive of no greater miscarriage of justice than subjecting Mr. Arbaugh to a term of imprisonment without affording him every opportunity to rehabilitate himself."

The miscarriage of justice language the majority invokes cannot be divorced from the language preceding it—that there must be a *"fundamental defect* which inherently results in a miscarriage of justice." In other words, if there is a fundamental defect *in the process* which has resulted in a circuit court decision causing a miscarriage of justice, then we may intervene. The focus under an abuse of discretion review is not on the outcome, but on the process that led to the outcome. *Levinger v. Mercy Med. Center,* 139 Idaho 192, 196, 75 P.3d 1202, 1206 (2003); *Schultz v. Darlington Mut. Ins. Co.,* 181 Wis.2d 646, 656, 511 N.W.2d 879, 883 (1994). The majority has failed to identify any fundamental defect in the *process* used by the circuit court because there simply was none.

Moreover, I disagree that a miscarriage of justice occurred. The majority finds that a miscarriage of justice occurred since Mr. Arbaugh lost his original probation due to "mi-

nor mistakes" that can be excused due to his age at the time of his crimes, the history of his own sexual abuse, and his fifteen to thirty-five year term of incarceration. None of these rationales are even remotely justifiable.

To begin, I disagree with the majority's decision to treat Mr. Arbaugh as a juvenile. His probation violations occurred when he was over eighteen. The fact that he was a juvenile when he committed his crimes is a "red-herring." We have observed in the past that a "term of probation has no correlation to the underlying criminal sentence .... In effect, there is a probation sentence which operates independently of the criminal sentence." Syl. pt. 1, in part, *Jett v. Leverette,* 162 W.Va. 140, 247 S.E.2d 469 (1978). Thus, the majority cannot relate probation violations back to the original offense to determine if the probation violations warrant revocation. Further, even if we could relate the probation violations back to his sexual offenses, Mr. Arbaugh never appealed his transfer to adult jurisdiction. By failing to appeal, he cannot now argue that his legal claims should be reviewed as if he were a juvenile when he committed his crimes. *See State v. Russell,* 791 P.2d 188, 190 (Utah 1990) ("The juvenile court certified defendant to stand trial as an adult. That certification was not challenged, and defendant must accept exposure to adult punishment."); *State v. Ross,* 166 Ariz. 579, 582, 804 P.2d 112, 115 (Ct.App.1990) (similar).

Moreover, what Mr. Arbaugh characterizes as "minor mistakes" included violating almost every probation requirement within four months after receiving probation, including marijuana and alcohol use, the failure to obtain counseling, the failure to report to his probation officer or alert his probation officer that he had moved, and job abandonment. I also find Mr. Arbaugh's claim that his marijuana use is comparable to a first offense

---

**3.** I also point out that *United States v. Juvenile,* 347 F.3d 778 (9th Cir.2003) is inapposite since *Juvenile* was not a Rule 35(b) case, but a case under the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031 to 5042 (2000). Indeed, *Juvenile* itself specifically observed that it was not dealing with probation. 347 F.3d at 786 n. 6 (citation omitted) ("The case that the government relies upon is inapposite [because] although it involved a juvenile, [it] dealt solely with the imposition of

probation conditions[.]") Finally, *Juvenile* notes the defendant there had poor performance within the first month or two while in rehabilitation, but then showed sustained improvement. *Id.* at 788. Here, Mr. Arbaugh did not show sustained improvement. I hardly think that expecting improvement after Chestnut Ridge, Stepping Stones, and Anthony Center constitutes "the implicit expectation that he would respond instantly to treatment[.]" *Id.* at 789.

mandating probation disingenuous. Mr. Arbaugh's drug use played a role in some of his sexual crimes and continued during his treatment at Chestnut Ridge and Stepping Stones.[4] Indeed, Mr. Arbaugh still does not have his drug habit under control. As shown by a supplement to the record in this case granted on November 21, 2003, while incarcerated at the Northern Regional Jail and Correctional Facility in Moundsville, he pled guilty in October 2003 to the felony of transporting marijuana into a correctional facility. W. Va.Code § 61–5–8(c) (1990) (2000 Repl. Vol.).[5]

Additionally, upon awarding probation, the circuit court made clear to Mr. Arbaugh that "we had problems before with controlled substances and ... the bottom line is that if you violate the terms of probation in any respect and particularly in regard to the use of controlled substances, you know what's going to happen." The court asked Mr. Arbaugh, "You know what the sentence is that's already been imposed?" Mr. Arbaugh responded, "Fifteen to thirty-five, Your Honor." After all the opportunities that the circuit court afforded Mr. Arbaugh, as well as the explicit admonishment that drug use meant probation revocation, the circuit court was well within its discretion in denying Mr. Arbaugh yet another opportunity to flout the court's authority.

In fact, we have previously upheld a Rule 35(b) denial in circumstances less compelling than those here. In *State v. Redman*, 213 W.Va. 175, 578 S.E.2d 369 (2003) (per curiam) we upheld Rule 35(b) probation denial by a defendant convicted of burglary and grand larceny who used drugs while on probation. We found that the circuit court did not abuse its discretion in denying the Rule 35(b) motion based upon the defendant's drug use as such use showed a disregard for the law. The circuit court's rationale which we affirmed in *Redman* (where only one probation term was violated, rather than the numerous violations occurring here) is practically identical to the rationale the circuit court applied below and which the majority reverses. *Compare*, maj. op. at 135, 595 S.E.2d at 292 (quoting circuit court's ruling below) *with Redman*, 213 W.Va. at 179, 578 S.E.2d at 373 (quoting circuit court's order) (" 'The Court finds that Mr. Redman has not learned his lesson from his earlier period of incarceration. He continues to break the law by using these illegal controlled substances. The Court further finds Mr. Redman is a detriment to society and that it is in the best interest of the public that he be kept out of society.' ")

In this case, the majority minimizes the seriousness of Mr. Arbaugh's drug and alcohol use by saying that it was unrelated to his sexual crimes and did not create a risk of re-offending. This assertion is flawed on almost every level. First, it is legally wrong. The revocation of probation in a sex crimes case (or, as here, the failure to re-award probation after a revocation) because of drug and alcohol use is permissible—not because drug use necessarily indicates a relapse to sexual behavior—but because the drug use shows a disregard for the obligations of probation. *See State v. Rogers*, 239 Mont. 327, 779 P.2d 927, 929 (1989) (finding that no terms of probation are minor and that defendant who plead guilty to sexual offenses properly had his probation revoked for smoking marijuana and drinking alcohol). *Cf. Collins v. State*, 712 P.2d 368, 371–72 (Wyo.1986) ("The court made it clear at sentencing that its concerns were to educate appellant and to keep him away from alcohol and drugs. These were the very conditions appellant violated. Appellant argues that 'individually the violations could be characterized as "nit-picky".' We do not agree, but, in any event, the violations taken together establish without question the fact that appellant was not serious about complying with the conditions of his probation.")[6]

---

4. In fact, the significance of Mr. Arbaugh's drug problem is evident from his statements at Stepping Stones (where he admitted frequent marijuana use) that the use of marijuana was not dangerous and that there is no problem in smoking marijuana.

5. I point out that if part of the YSS plan was to move Mr. Arbaugh away from the Eastern Panhandle to the Northern Panhandle to get him away from drugs, that this conviction shows the futility of this view.

Second, the factual premise of the majority's assertion is simply not substantiated by the record. The record shows that Mr. Arbaugh conducted some of his attacks on his numerous victims while intoxicated. Moreover, Chestnut Ridge found that "[h]e has identified high risk factors for re-offending that include substance abuse[.]"

Finally, assuming it is appropriate to apply probation violations to the underlying crimes, several of Mr. Arbaugh's probation violations did indeed relate to his sex crimes. Mr. Arbaugh's probation required that he attend monthly counseling. Mr. Arbaugh attended one session and never returned. Another requirement prohibited him from violating any laws. As a convicted sexual offender, Mr. Arbaugh was subject to the West Virginia Sexual Offender Registration Act ("SORA"), W. Va.Code §§ 15–12 –1 to –9 (2000 Rep. Vol.) (2003 Supp.). Under SORA, Mr. Arbaugh was required to inform the registry within ten days when, among other things, he "changes his ... residence [or], address[.]" By moving from his probation address without permission and not notifying the SORA registry, Mr. Arbaugh not only violated the term of his probation requiring him to apprize his probation officer of his location, but also violated the term requiring him not to violate any laws. In light of Mr. Arbaugh's drug use (an indicator of his re-offending), and his failure to adhere to the circuit court's emphatic admonishment that he would lose his probation if he violated the probation terms (especially drug use), I can-

not find that the circuit court in anyway abused his discretion in denying Mr. Arbaugh yet another rehabilitation program.[7] Rather than reversing, we should affirm the decision below with commendations to both the circuit court and the Prosecuting Attorney for their efforts to assist this young man by "provid[ing] everything the Court was aware of [.]" [8]

Given my review of the record in this case, "I think that the circuit judge probably had a good handle on this situation." *State ex rel. Nelson v. Grimmett*, 199 W.Va. 604, 608, 486 S.E.2d 588, 592 (1997) (Starcher, J., concurring). Mr. Arbaugh's behavior shows a recurring theme-at any point when Mr. Arbaugh was not under the strictest supervision, he was unable to handle his freedom and he resorted to unacceptable behaviors such as drinking, drug use, failing to attend counseling (all of which are related directly to his sexual crimes), and job abandonment. We are not doing Mr. Arbaugh any favors by reinforcing a belief that life has no consequences or that unacceptable actions can be excused based upon unfortunate circumstances. *See Juvenile*, 347 F.3d at 791 (Gould, J., dissenting in part) ("There is no question but that abuse of [the appellant] by others when he was a young child may have contributed to [his] becoming, in turn, a repeat abuser of younger children. The majority's approach to this is to give him a pass at an earlier age, but this approach ignores that [appellant's] predatory abuse of other children, if not restrained, can continue a cycle of abuse and corruption of youth.")

---

**6.** I am aware that in *State v. Minor*, 176 W.Va. 92, 95, 341 S.E.2d 838, 841 (1986) (per curiam), we found that probation should not be revoked for minor technical violations. In *Minor*, however, we found such minor technical violations to include a non-contumacious failure to pay restitution and efforts on the part of the probationer to inform her probation officer of the circumstances of the non-payment. Here, Mr. Arbaugh's conduct, including drug use, failure to report to his probation officer, job abandonment, and failure to pay his probation fee, falls well beyond minor technical violations.

**7.** I also have to question the majority's reliance on the YSS program in this case. First, at the Rule 35(b) hearing, Mr. Arbaugh's own counsel stated that YSS "doesn't usually take offenders of

this nature ...." Second, even in light of the YSS program, the majority feels it necessary to add additional terms to the YSS probation plan. I hardly think that in light of these observations that the majority's reliance on YSS to find the circuit court erred below is justifiable.

**8.** Finally, to the extent that the majority implies the DHHR was somehow responsible because they allowed Mr. Arbaugh and his brother to run away from its custody, I note that the record on this point is less than clear. In any event, we have held that actions of the DHHR *qua* State are not imputed to the State *qua* State when the State invokes its criminal law authority through the Office of a Prosecuting Attorney. *State v. Miller*, 194 W.Va. 3, 13, 459 S.E.2d 114, 124 (1995).

Indeed, I see a significant practical problem with the majority opinion. What if Mr. Arbaugh chooses yet again to ignore the requirements of his probation? What consequences will Mr. Arbaugh's violations entail? Will the circuit court ever feel justified in revoking Mr. Arbaugh's new probation or will it feel compelled to turn a blind eye if Mr. Arbaugh violates his probation-much as this Court has turned a blind eye to the facts and law governing this case?

### D. The majority opinion places itself above the law and "breaks down one of the necessary conditions of a decent society" by reading its personal desires into the law.

My greatest concern in this case, however, is not that the majority has bent, stretched, ignored and distorted law and facts to afford Mr. Arbaugh yet another opportunity to avoid prison (although my concern in this regard, both for Mr. Arbaugh and society, is not inconsequential). Rather, my greatest concern is that the majority opinion is "a 'wolf in sheep's clothing,' for [its] rationale is no more than ... [its own] *subjective* judicial judgment as to what ... offends notions of 'fundamental fairness.'" *Williams v. Illinois*, 399 U.S. 235, 259, 90 S.Ct. 2018, 2031, 26 L.Ed.2d 586, 603 (1970) (Harlan, J., concurring).

In this case, the majority substitutes its judgment for that of the circuit court to remedy what the majority personally views to be a "miscarriage of justice." In the past, this Court has wisely refused the temptation to use its power as an anodyne to remedy that which we might have thought personally to be objectionable. *See State v. Phillips*, 205 W.Va. 673, 684, 520 S.E.2d 670, 681 (1999) (noting that we decide cases "not only upon the[ ] facts [of a given case], where our sympathies might well lie ..., but in a larger context."); *Hart v. NCAA*, 209 W.Va. 543, 548, 550 S.E.2d 79, 84 (2001) (per curiam) ("When all factors have been weighed on the scales of justice, though, this Court remains constitutionally bound to follow the guiding precedents before us, to apply the law as it has been interpreted by our predecessors, and to reach the result prescribed thereby.") "[T]here are many perfectly legitimate reasons for summary rejection of a Rule 35(b) motion, despite the presentation of an otherwise persuasive or sympathetic case by a defendant." *Head*, 198 W.Va. at 305, 480 S.E.2d at 514 (Cleckley, J., concurring). In other words, that a defendant may present "" 'an affecting case for reconsideration of the sentence,' "" is simply not a factor upon which we can rely to reverse a circuit court. *Matthews v. United States*, 629 A.2d 1185, 1199 n. 30 (D.C.1993) (quoting *Walden v. United States*, 366 A.2d 1075, 1077 (D.C.1976)) (quoting *United States v. Krueger*, 454 F.2d 1154, 1155 (9th Cir.1972)). The majority reneges on our commitment that " 'the judiciary of this state is dedicated to the principle that ours is a government of laws and not of men.' " *Committee on Legal Ethics v. Karl*, 192 W.Va. 23, 34, 449 S.E.2d 277, 288 (1994) (citation omitted).

I continue to believe that " '[i]f we destroy the law's integrity in the pursuit of some goal, however worthy, we break down one of the necessary conditions of a decent society.' " *Dunlap v. Friedman's, Inc.*, 213 W.Va. 394, 403 n. 4, 582 S.E.2d 841, 850 n. 4 (2003) (Davis, J., dissenting) (citation omitted). While I do not dispute the majority's sincerity that there was a miscarriage of justice in this case, such personal beliefs cannot be the criteria under Rule 35(b). "Our duty, to paraphrase Mr. Justice Holmes in a conversation with Judge Learned Hand, is not to do justice but to apply the law and hope that justice is done." *Bifulco v. United States*, 447 U.S. 381, 401–02, 100 S.Ct. 2247, 2259–60, 65 L.Ed.2d 205, 220 (1980) (Burger, C.J., concurring).

Thus, I dissent. I am authorized to state that Chief Justice Maynard joins me in this dissenting opinion.

ALBRIGHT, J., concurring, joined by
STARCHER, J. and MCGRAW, J.
(Filed March 5, 2004)

I concur in the result reached by the majority but disassociate myself from the majority opinion insofar as it has been construed by the dissent filed in the case to justify treating the rule-making power of this Court as capable of altering the punishments imposed by legislative enactment for crimes,

or capable of impermissibly changing the statutorily mandated conditions under which courts may lawfully grant probation. Davis, J. dissent at 138, 595 S.E.2d at 295. I especially disassociate myself from any effort that may be gleaned from the majority opinion to, in the words of the dissent, "place[ ] itself above the law and 'break[ ] down one of the necessary conditions of a decent society' by reading its personal desires into the law." Davis, J., dissent at 134, 595 S.E.2d at 301.

### The Grounds for Concurrence in the Result

I concur in the result reached by the majority because:

1. Pursuant to West Virginia Code § 62-12-10, a judge, having determined that one or more conditions of probation have been violated, "may revoke the suspension of imposition or execution of sentence, impose sentence if none has been imposed, and order that sentence be executed.... If, despite a violation of the conditions of probation, the court or judge shall be of the opinion that the interests of justice do not require that the probationer serve his sentence, the court or judge may, except when the violation [of probation] was the commission of a felony, again release him on probation." (Emphasis added.)

2. Nothing in our law **requires the revocation of probation** and imposition of sentence after the Court learns of one or more probation violations.

3. The circumstances of this case require that, if probation was to be actually revoked for the multiple probation violations appearing from the record, the only sentence available to the court upon revocation was fifteen to thirty-five years in prison.

4. The defendant was subjected to sexual abuse by family members and at least one teacher, **the abuse dating from the age of reason,** that is from age seven or eight. *As a direct result of these attacks,* the defendant, at or about age fourteen, "acted out," committing against his younger half-brother the same types of sexual crimes of which he himself had been a victim in prior years.

5. At age fifteen the defendant was charged with delinquency as a result of this conduct and forthwith transferred to the adult jurisdiction, thus requiring that the defendant be treated as an adult and not afforded treatment as a juvenile.

6. It appears that, by reason of the seriousness of the crime involved, the transfer to adult jurisdiction was mandatory under West Virginia Code § 49-5-10, the applicable juvenile justice statute. Thus the statute, at that point, required adult criminal prosecution for his conduct and, as punishment, potential imprisonment for fifteen to thirty-five years, rather than treatment as juvenile.

7. As horrible as defendant's underlying crimes might have been, especially in terms of their impact on the half-brother victim and defendant's relationship with other well-behaved members of his family, a possible thirty-five-year term of imprisonment at defendant's age and in these circumstances cries out for close scrutiny under every principle of justice.

8. The record before us does not disclose that anyone—the State or any private party—has fully diagnosed the impact of and remedies necessary to guide this defendant from the nightmare of childhood sexual abuse, through his own disgusting, but youthful, criminal conduct, past all the anger and frustration generated in him by these events, to the point where the defendant overcomes his own apparently stubborn reluctance to fully cooperate in his recovery. I am satisfied that another effort, short of prison, is more likely to gain the defendant's adherence to society's norms of behavior than is thirty-five years in prison.

9. The record does demonstrate that the trial court attempted at least three available alternatives and that the defendant, to some substantial degree, succeeded in improving his conduct for varying periods of time in some structured situations.

10. The probation violations upon which the execution of this fifteen to thirty-five year sentence was predicated may be summarized as: (1) alcohol and marijuana abuse, (2) lack of anger control, (3) lack of respect for authority, (4) failure to take advantage of

all counseling opportunities and (5) failure to observe the administrative rules for probation.

11. Under the provisions of West Virginia Code § 62–12–9, a court may modify the conditions of probation at any time, including requiring intermittent or continuous confinement in jail for up six months.

12. Under the painful circumstances of this case, I believe the trial court should have used the defendant's application for a reduction of sentence to further explore every available alternative to requiring the continued execution of the fifteen to thirty-five year sentence applicable to this case.

13. The trial court originally granted probation for a five-year term running from September 12, 2000, to September 11, 2005; hopefully, time remains to successfully turn this young man around without more prison time.

14. In addition to possibly requiring some jail time, continuous or intermittent, the court has at its disposal an opportunity to enroll the defendant in the program offered by Youth Systems Services, predicated on the articulated belief that the defendant "can be saved and can be brought around to a pro-social life."

15. The operative decision of a majority of this Court to reverse and remand "with directions" means simply that the lower court should, at this time, reverse its decision to revoke the defendant's probation and consider and adopt, before the term of probation expires, alternative means of attempting to secure the defendant's adherence to the norms of society, including further consideration of the Youth Systems Services option, additional jail time and any other community-based alternative, leaving always the option, if these efforts fail, of requiring the execution of the long sentence of incarceration required by the defendant's conviction.

It is easy to fathom the total frustration the trial court might well have felt in once again considering the defendant's recalcitrant behavior—given the many opportunities for rehabilitation previously extended to the defendant and lost by his erratic conduct. Notwithstanding that quite understandable frustration, the defendant's age and the miserable circumstances of his past life combine to strongly suggest that "a possible thirty-five year term of imprisonment ... cries out for close scrutiny under every principle of justice."

### The Grounds Stated in Dissent

Those who dissent from this decision suggest that it is necessary to construct a confrontation between legislative intent in the Youthful Offender Act, West Virginia Code § 25–4–1, et seq., and the constitutional rule-making power of this Court. The dissent first grounds its claim on syllabus point 4 of *State v. Richards*, 206 W.Va. 573, 526 S.E.2d 539 (1999), and *State v. Patterson*, 170 W.Va. 721, 296 S.E.2d 684 (1982), asserting that this Court has previously determined that *if probation is revoked after enrollment in the youthful offender program, the trial court has no option other than to require execution of the sentence applicable to the crime for which probation was granted.* Such an assertion gives the cited cases an inappropriately rigid reading. In *Richards*, the trial court had imposed *a harsher sentence* after the revocation of sentence than it had imposed beforehand. Although syllabus point four of *Richards* does not expressly capture the controlling factual circumstances of the case, *Richards*, read in context, simply prohibits the execution of a *harsher* sentence after revocation of probation than any sentence earlier imposed but suspended incident to the grant of probation. *Patterson* is even less persuasive. In that case, the defendant speciously claimed that he was unaware that he might be sentenced to prison if he violated probation. In the *Patterson* opinion, Justice Harshbarger disposed of that claim based upon the clear evidence in the case that the defendant had been fully advised of the harshest consequences of violating probation. Neither of the cases cited in the dissent truly assist the Court on the facts of this case.

The next assertion in the dissent is that by utilizing Rule 35 of the West Virginia Rules of Criminal Procedure to effect a further term of probation for the defendant the majority undertakes to unconstitutionally alter the *substantive* law enacted by the Legislature specifying penalties for crimes by an

improper utilization of the rule-making power vested by the Constitution in this Court to alter the *"substantive"* law of the State. There follows a long discussion of the distinction between *substantive* and *procedural* law, which proves ultimately unrewarding and largely irrelevant.

Stripped to the bone, the dissent argues that once probation is revoked and a sentence ordered executed, the trial courts are without jurisdiction to later grant probation, and that any attempt to utilize Rule 35 of the West Virginia Rules of Criminal Procedure to effect such a result unconstitutionally infringes on the prerogative of the Legislature to define the penalties attached to conviction of particular crimes because such action amounts to an attempted amendment of substantive law. Tying this argument to the Youthful Offender Act by reliance on *Richards* and *Patterson,* discussed above, does not cure the fatal defects in the argument which are readily apparent for the reasons next discussed.

West Virginia Code § 62–12–3 expressly limits the authority of the trial courts to suspend execution of a sentence and place a defendant on probation to a period ending no more than sixty days after a defendant has actually been imprisoned. On the other hand, Rule 35(b) expressly defines a "reduction of sentence" to include "[c]hanging a sentence from a sentence of incarceration to a grant of probation" and provides further that:

> A motion to reduce a sentence may be made, or the court may reduce a sentence without motion within 120 days after the sentence is imposed or **probation is revoked,** or within 120 days after the entry of a mandate by the supreme court of appeals upon the affirmance of a judgment of a conviction or **probation revocation** or the entry of an order by the supreme court of appeals dismissing or rejecting a petition for appeal of a judgment of a conviction or **probation revocation.** The court shall determine the motion within a reasonable time. . . .

Rule 35(b), W.Va. R.Crim. P. (emphasis added).

First, it is readily apparent that West Virginia Code § 62–12–3, allowing a legislatively determined sixty-day period after imprisonment for reconsideration of a sentence, West Virginia Code § 62–12–10, expressly allowing release on probation even after prior probation violations have been declared by the trial court, and Rule 35, expressly treating a change of sentence from incarceration to probation as a "reduction of sentence," combine to equip the trial courts, *inter alia,* with the discretion to set aside an earlier revocation of probation, suspend further execution of the sentence of incarceration, and re-institute a term of probation. There is nothing in the Youthful Offender Act that suggests any legislative intent whatever to deprive the trial courts of that discretion in cases where that sentencing alternative has been utilized. Moreover, nothing in our case law—including *Richards* and *Patterson*—requires such an awkward result.

■ Second, if this Court's treatment of Rule 35 in this case constitutes a constitutionally impermissible intrusion into the Legislature's sentencing powers, then the provisions of Rule 35, allowing reconsideration of sentencing decisions within a variety of one-hundred-twenty-day time limitations—**clearly in excess of the sixty day limitations found in West Virginia Code § 62–12–3**—have been in violation of the constitution since first adopted February 1, 1985, nearly twenty years ago.

Either the dissent is dead wrong in its assertion that the application of Rule 35 in this case undertakes a constitutionally impermissible intrusion upon the Legislature's power to define punishments for crimes, or the usage of Rule 35 at any time more than sixty days following actual imprisonment, as provided for in West Virginia Code § 62–12–3, is likewise constitutionally impermissible. I am utterly unable to agree with such a result. Especially in light of the long and stable history of Rule 35 in our jurisprudence, the rule is, in my view, a wholly proper exercise of this Court's constitutional power to "promulgate rules for all cases and proceedings, civil and criminal, . . . relating to writs, warrants, process, practice and procedure, which shall have the force and effect

of law." W. Va. Const. art VIII, § 3. Rule 35 is broad enough in its thrust and intent to permit the trial court in this case to reconsider, within the court's range of discretion, not only the sentencing options in the case, but the underlying decision of whether revocation of probation was appropriate under all of the circumstances, or whether, in the alternative, some change in the prior conditions or term of probation would better serve the public interest. The dissent has manufactured a needless constitutional confrontation, all utterly unnecessary in the circumstances.

### Above the Law

The justices who dissent from this Court's decision perceive that the majority opinion seeks to "place[ ] itself above the law and 'break[ ] down one of the necessary conditions of a decent society' by reading its personal views into the law." Davis, J., dissent at 144, 595 S.E.2d at 301. I cannot fathom why the dissenters would choose such a personal and cutting means of expressing their disapproval of the majority opinion. Likewise, I am struck by the much more extensive recital of the defendant's alleged misdeeds while on probation, which appears with devastating effect in the dissenting opinion, compared to the considerably less emotional recital of those misdeeds appearing in the majority opinion. Suffice it to say that regardless of which version of the facts one reads, the case still boils down to the fact that defendant was sentenced to fifteen to thirty-five years for alcohol and drug use, mixed with some pretty nasty rejection of authority. I do not believe that the recital of the facts contained in either the majority or dissenting opinions demonstrates that incarceration for up to thirty-five years is preferable to another effort to bring the defendant "around to a pro-social life." [1]

"Abuse of discretion," as a term of art, has a harsh ring. As noted, the frustration of the trial judge in his dealings with the defendant is entirely understandable. In my view, the abuse of discretion in this case does not proceed fundamentally from any defect in those efforts. However, contrary to those who dissent, I believe the revocation of probation and execution of sentence constituted an abuse of discretion in all of the circumstances surrounding this case. The ruling here appealed proceeds not from the trial judge's understandable frustration, but from the fact that our law required this case to be treated from its inception as an adult crime. In light of the life experiences of this defendant, that treatment led, more or less inexorably, to a decision to incarcerate this defendant for up to thirty-five years under statutory provisions that, on their face, do not fully accommodate the reality that the underlying crimes in this case were committed by a person barely fourteen years of age who is considered unlikely to re-offend, a person who has been a victim himself of equally or perhaps worse crimes, a person who has demonstrated some ability to improve in a structured situation, albeit not completely, a person whose probation was revoked for violations of probation much less serious than the underlying crimes. Finally, I am mindful of the potential for this young defendant, who was initially sexually victimized at such a tender age, to again be sexually victimized if it is necessary to continue his incarceration. Our law provides at least one more opportunity for the defendant to rehabilitate himself. Again, the case "cries out for close scrutiny under every principle of justice." Bypassing that probably last opportunity would clearly be a miscarriage of justice. As Justice Starcher has remarked in pondering this case:

> A decent society is where a *child* who has been sexually victimized for years, and who becomes seriously disordered—but who does work in structured situations to improve—gets our *help*, not a thirty-five year prison sentence.

As the author of this concurring opinion, I am authorized to say that Justice Starcher and Justice McGraw join in this opinion.

---

1. It is noted that incarceration in prison costs about $20,000 per year per convict. In the circumstances of this case, an investment of a year or so in a final effort to salvage this defendant from a long life in prison—at a cost to taxpayers of up to $700,000—is worthwhile for obviously practical reasons. It is my fervent hope that if the defendant is given this "last chance," he will grasp and make the most of it.

STARCHER, J., concurring, in part, and dissenting, in part.

(Filed March 31, 2004)

I concur in the extraordinarily well-reasoned, compassionate, and legally sound separate opinion by Justice Albright. I write separately to shed some further light on the *bipolar opinion* of the Court in this case—an eleven-page *per curiam* opinion with its twenty-page dissent.

I write to express my amazement and displeasure with the personal attacks that the author of the dissent has made upon the articulation of the facts and law and the conclusions in the *per curiam* opinion.

For a random sample of these remarks from the dissent, consider:

> ... the majority eviscerates the law to effectuate its own personal view of a proper outcome in this case....

> .... the majority usurps the legislature's power ....

> .... the majority has arrogated to itself the substantive power to define .... The majority would do well to remember that ... power is the "very definition of tyranny."

> .... the majority's facts are, *as far as they go,* accurate.

(Emphasis added.)

> .... the surest way to convey misinformation is to tell the strict truth.

> .... I turn to the flaws in the majority's application of [the rule].

> **D.  The majority opinion places itself above the law and "breaks down one of the necessary conditions of a decent society" by reading its personal desires into the law.**

(Bold italics in original.)

> .... the majority has bent, stretched, ignored and distorted law and facts ....

> .... The Majority's Opinion Is A "Wolf In Sheep's Clothing," For [Its] Rationale Is No More Than ... [Its Own] *Subjective* Judgment ....

(Brackets and italics in original.)

> .... the majority substitutes its own judgment for that of the circuit court
> ...

The majority reneges on our commitment ....

I continue to believe that "[i]f we destroy the law's integrity in the pursuit of some goal, however worthy, we break down the necessary conditions of a decent society."

Incredible.

While I agree with the result of the *per curiam* opinion, I am not happy with the gratuitous license that the author of the dissent took in the twenty-page dissent that was filed on the heels of the *per curiam* opinion to ridicule and belittle the legal analysis in the *per curiam* opinion. Using twisted logic, the dissent erroneously casts the *per curiam* opinion as appearing to attempt to wreck our State's jurisprudence, not fully disclosing all of the facts, misapplying fairly simple law, and singling out an outstanding trial judge for a spanking. None of this is true, and the author of the dissent knows that no justice of this Court would consider even drafting such an opinion—even if that justice personally disagreed with the ultimate result.

During oral argument of this case, in subsequent discussions, and prior to any opinion being written (or at least being circulated), there was a search by this Court for some way within the bounds of existing law to prevent a less-than-twenty-year-old person from facing an up-to-thirty-five-year sentence—for behavior that last occurred prior to his fifteenth birthday, and for more recent misbehavior, consisting of not complying with conditions of probation: smoking marijuana, drinking alcohol, not attending counseling sessions, not accepting authority, etc.

The fact is that a maximum penal sentence was ultimately imposed as a result of, solely the latter activities.

To me, a decent society is where a *child* who has been sexually victimized for years, and who becomes seriously disordered—but who does work in structured situations to improve—gets our *help,* and not a thirty-five-year prison sentence.[1]

In writing separate opinions, I have personally tried to avoid making what I consider

---

1.  For another reason why the taxpayers of our    State should not be supporting this young man in

to be the most glaring errors of the dissent in the instant case—that is, including in an opinion harsh, apocalyptic, hyperbolic, and personal attacks on the integrity and motivations of other members of this Court. I will adhere to that principle in this opinion. I wish that the dissenters had done the same.

It is noted that I joined in the other separate opinion that has been filed in this case. Herein I fully subscribe to the remarks contained in that opinion.

Therefore, for the reasons stated, I concur in the result of the majority opinion, but I dissent and dissociate myself from the rationale of the reasoning subscribed to by its author. I cannot say that any other justice joins me in my separately stated views of this *bipolar opinion;* however, I am satisfied that if Judge Marmaduke Dent (West Virginia Supreme Court 1893–1904) were on this Court today, he would share my views and join with me in this writing.[2]

MAYNARD, C.J., dissenting.

(Filed April 7, 2004)

The last thing this case needs is another separate opinion. Nevertheless, I now write separately, in spite of the fact I joined Justice Davis's dissent, because I am deeply concerned that the several opinions extant in this case, the majority and two concurrences, might cause confusion about the law to be applied regarding probation grants following sentencing under the Youthful Offender Act, W.Va.Code § 25-4-6 (2001 Repl.Vol.). In the interest of brevity and judicial economy,

I have decided to respond only to the first concurring opinion that was filed-the one that actually reaches the merits of the case.

The first concurring opinion cites the general probation statute, W. Va.Code §§ 62-12-1 to -24 (2000 Repl.Vol.), to support its analysis. However, I believe the probation at issue in this case is controlled by the Youthful Offender Act. While the general probation statute and the Youthful Offender Act both deal with probation and can be read together, *State v. Richards,* 206 W.Va. 573, 575 n. 4, 526 S.E.2d 539, 541 n. 4 (1999) (citing *State v. Reel,* 152 W.Va. 646, 651, 165 S.E.2d 813, 816 (1969)), "'the two statutory schemes do not coincide in all areas and are, no doubt, the embodiment of separate legislative purposes.'" *Id.,* 526 S.E.2d at 541 n. 4 (quoting *State v. Martin,* 196 W.Va. 376, 380 n. 3, 472 S.E.2d 822, 826 n. 4 (1996) (per curiam)). We have therefore observed that "if there were some discrepancy between the two statutes, § 25-4-6 is the more specific and thus controlling law on this subject." *Id.,* 526 S.E.2d at 541 n. 4.[1] Because the general probation statute does not contain the same bar to re-awarding probation after revocation as does § 25-4-6 of the Youthful Offender Act, the Youthful Offender Act is the controlling statute in this case and the outcome in this case should be controlled by Syllabus point 4 of *State v. Richards,* 206 W.Va. 573, 526 S.E.2d 539 (1999), the *sole* Syllabus of *State v. Patterson,* 170 W.Va. 721, 296 S.E.2d 684 (1982), and the *sole* Syllabus of *State v. Martin,* 196 W.Va. 376, 472 S.E.2d 822 (1996)

---

our prison system for up to the next thirty or more years, I refer you to recently expressed remarks by Chief Justice Elliot Maynard. In addressing the need for reducing our prison and jail population, he said "I intend, this year, to work very hard to establish a community corrections system statewide that will help with the rate of incarceration problems.... What it does mean is finding alternatives to just straight 'lock them up, throw away the key and forget them.'" Kay Michael, "The Honorable Elliott E. Maynard 2004—Court Improvement," *The West Virginia Lawyer* P. 20 (Jan.2004). I applaud this effort.

**2.** See *Hartigan v. Board of Regents of West Virginia University,* 49 W.Va. 14, 38 S.E. 698 (1901) (dissenting opinion), John Phillip Reid, *An American Judge* 103–106 (1968).

**1.** The rule that a more specific statute controls over a more general statute when the two are in conflict is not a novel point of law unknown to

the author of the concurring opinion. Indeed, my brethren have applied this point of law in a previous majority opinion finding that:

> Because the grandparent act is *specific legislation* drafted and adopted for the express purpose of addressing the issue of visitation, its provisions must necessarily be viewed as controlling when a question arises regarding the application of another code provision with regard to the issue of grandparent visitation.

*State ex rel. Brandon L. v. Moats,* 209 W.Va. 752, 759, 551 S.E.2d 674, 681 (2001) (emphasis added). The concurring opinion makes no effort to show why the reasoning in *Brandon L.,* applying the more specific statute, does not equally have force here where the Youthful Offender Act's probation provision is more specific than the general probation act upon which the concurrence relies.

(per curiam). Thus, I do not find the concurring opinion's reliance on the general probation statute to be the correct analysis. Further, I think the approach outlined herein is the analysis and method currently used and understood by circuit judges in West Virginia in Youthful Offender sentencing situations. Based upon these considerations, I respectfully dissent.

Having dissented to the law, I now write to state a policy concern of mine regarding this case and others similarly situated. I believe that sentencing, and especially whether to grant probation or not, is usually best left to trial judges. This is so for several reasons. Chief among them is the fact that the trial judge sees the defendant in person, interacts with him or her, can see the defendant's demeanor and attitude, and observes a hundred other subtle factors which enable the trial judge to determine the defendant's remorse or lack thereof. Since this Court never sees the defendant, we cannot make the same crucial observations. Therefore, absent some truly horrible mistake, I would leave criminal sentencing and probation decisions to the sound discretion of our very wise trial judges.