632 S.E.2d 899

KANAWHA COUNTY BOARD OF
EDUCATION, Petitioner
Below, Appellant,

v.

Johnny SLOAN, Respondent
Below, Appellee.

No. 32783.

Supreme Court of Appeals of
West Virginia.

Submitted: Jan. 25, 2006.

Decided: Feb. 17, 2006.

Concurring and Dissenting Opinion of
Justice Benjamin July 19, 2006.

James W. Withrow, Kanawha County Board of Education, Office of General Counsel, Charleston, for the Appellant.

John Everett Roush, West Virginia School Service Personnel Association, Charleston, for the Appellee.

PER CURIAM:

The appellant herein and petitioner below, the Kanawha County Board of Education (hereinafter referred to as "the Board"), appeals an order entered December 13, 2004, by the Circuit Court of Kanawha County. By the terms of that order, the circuit court affirmed a Level IV decision by the West Virginia Education and State Employees Grievance Board (hereinafter referred to as "the Grievance Board"), which reversed the Board's prior termination of the appellee herein and respondent below, Johnny Sloan (hereinafter referred to as "Mr. Sloan"), upon findings that he had engaged in three acts of sexual harassment and immorality against a fellow employee. Upholding the Grievance Board's decision, the circuit court reinstated Mr. Sloan to his previous position as a custodian, with all attendant benefits including back pay and seniority, but suspended him for three days without pay commensurate with the three instances of immoral conduct he was found to have committed against a coworker. On appeal to this Court, the Board contends that the circuit court erred

by upholding the Grievance Board's ruling. Upon a review of the parties' arguments, the record submitted for appellate consideration, and the pertinent authorities, we affirm in part that portion of the circuit court's December 13, 2004, order which found that Mr. Sloan had committed immoral conduct rather than sexual harassment vis-a-vis Ms. Akers. We further reverse in part that portion of the circuit court's order which adopted the Grievance Board's recommendation that Mr. Sloan should be reinstated to his employment less a three-day unpaid suspension and instead find that reinstatement less a six-month unpaid suspension is the more appropriate discipline in this case. Finally, we remand this matter for further proceedings consistent with this opinion.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The facts underlying the instant appeal are largely undisputed by the parties. During the 2001–2002 school year, Mr. Sloan was employed by the Board as a custodian at Bridgeview Elementary Center in Kanawha County, West Virginia. Mr. Sloan had been employed in this position for approximately nine years, and had worked for the Board as a custodian for approximately twenty-seven years. In 2001–2002, the complainant below, Brenda Akers (hereinafter referred to as "Ms. Akers"), was employed by the Board as a classroom aide at Bridgeview Elementary Center. She had worked at this school for approximately two years, and had been a full-time employee of the Board for approximately seven years.[1]

As part of his assigned custodial duties, Mr. Sloan was stationed in the school cafeteria during lunchtime to assist students in emptying their trays into the trash cans. Although Ms. Akers' lunchroom duty required her to assist a special needs student during the lunch period, she routinely left her post to go to the area where Mr. Sloan was stationed to converse with him for approximately thirty minutes per day. Over the course of the school year,[2] Mr. Sloan and Ms. Akers would talk regularly during the lunch period, at Mr. Sloan's cafeteria station, and became friendly with each other, sharing information about their families, personal lives, and finances and asking each other for advice. With regard to personal financial matters, Ms. Akers twice asked Mr. Sloan to loan her money, first in the amount of $200, and later in the amount of $300, both of which requests Mr. Sloan refused. During these lunchtime conversations, Ms. Akers would occasionally touch Mr. Sloan on the arm or shoulder; her body also frequently brushed against his when they conversed. Mr. Sloan commented to Ms. Akers that she looked nice when she wore low-cut blouses, to which she responded by laughing.

In April, 2002, during one of their lunchtime conversations, Mr. Sloan asked Ms. Akers if she would let him perform oral sex on her. Ms. Akers moved away from Mr. Sloan's work station, and did not respond to his comment. On another occasion, Mr. Sloan repeated this proposition, but offered Ms. Akers $100 in exchange therefor because, he claims, she had repeatedly asked to borrow money from him. Ms. Akers responded that he would not do that to his wife. Later in the school year, Mr. Sloan saw Ms. Akers outside the school building near his regular station at the cafeteria in the front of the building. Because Mr. Sloan knew that Ms. Akers' routine was to walk in the rear of the school building, he thought that she was approaching him because she wanted to talk with him. Mr. Sloan approached Ms. Akers to talk with her, showed her some money, and mentioned that there were places in the school building that they could go for some privacy. Ms. Akers walked away from Mr. Sloan without responding to his solicitation. After these incidents, Ms. Akers continued to leave her lunch station to chat with Mr. Sloan in the

---

1. The record demonstrates that the Board provided annual sexual harassment training to both Mr. Sloan and Ms. Akers and that both employees had received such training for several years.

2. It appears from the record that Mr. Sloan's and Ms. Akers' friendship began during the latter part of the 2000–2001 school year and continued throughout the 2001–2002 school year.

cafeteria at his post. At the end of the school year, as Mr. Sloan was leaving the cafeteria, Ms. Akers commented to him that she thought she had earned that $100. Mr. Sloan questioned Ms. Akers as to why that was her belief, but she did not respond.

Ms. Akers first reported these incidents of alleged sexual harassment by a letter addressed to the Board and dated August 13, 2002. According to her letter, Ms. Akers resigned her employment with the Board on June 26, 2002, but waited to notify the Board of her allegations because of "the emotional distress [she had] endured." Following the Board's receipt of Ms. Akers' complaint, an investigation was conducted regarding these charges.[3] During the investigation, Mr. Sloan admitted that he had engaged in the above-described conduct, explained that he was under the impression that Ms. Akers was interested in an intimate relationship with him, and apologized for his actions. Upon the conclusion of the investigation, the Board terminated Mr. Sloan's employment on November 12, 2002, concluding that he had committed three acts of sexual harassment.

Mr. Sloan filed a Level IV appeal[4] of his termination with the Grievance Board on November 20, 2002.[5] During its review of the matter, the Grievance Board found that Mr. Sloan had never previously been disciplined by the Board, that he annually received sexual harassment training as a Board employee, and that he had received the highest possible rating on his job performance evaluations for the three years prior to the incidents in question. Moreover, during his testimony before the Grievance Board, Mr. Sloan admitted that he had committed the aforementioned acts, apologized for his conduct, explained that he had made these comments only because he believed Ms. Akers was interested in a relationship with him, and acknowledged that he should not have made such statements to Ms. Akers. Ms. Akers did not testify before the Grievance Board.[6]

By decision rendered March 24, 2003, the Grievance Board reversed the Board's termination of Mr. Sloan and reinstated him to his prior position with benefits, but suspended him for three days without pay commensurate with the three instances of immoral conduct he was found to have committed against Ms. Akers. In reaching its decision, the Grievance Board determined that Mr. Sloan's conduct did not come within the specific definition of sexual harassment[7] as earlier found by the Board, but rather constituted the more general offense of immorality[8]. Due in large part to Ms. Akers' lack of testimony in the grievance proceedings, the Grievance Board determined that it could not ascertain whether Mr. Sloan's comments

---

3. Pending the investigation, the Board suspended Mr. Sloan, with pay, from his job as a custodian at Bridgeview Elementary Center. Such suspension took effect on August 27, 2002.

4. W. Va.Code § 18A–2–8 (1990) (Repl.Vol.2004) authorizes a board of education employee who has been disciplined in accordance with this section to appeal such decision directly to Level IV of the West Virginia Education and State Employees Grievance Board. For further treatment of W. Va.Code § 18A–2–8, see Section III.B., *infra.*

5. In his Statement of Grievance, Mr. Sloan recounted that
   [t]he Respondent [Board] has dismissed the Grievant [Mr. Sloan] from his position as a regularly employed custodian on the basis of sexual harassment. The Grievant contends that he did not engage in sexual harassment. The Grievant additionally contends that the Respondent has engaged in disparate treatment and that dismissal by the Respondent is too harsh a penalty. The Grievant alleges a

violation of West Virginia Code § 18A–2–8 and § 18A–2–7.
   The relief sought by Mr. Sloan requested that "Grievant seeks to be returned to his employment as a regularly employed custodian, retroactive wages, benefits, and regular employment seniority. The Grievant also seeks interest on all monetary awards."

6. During the course of the Level IV grievance hearing, counsel for Mr. Sloan called as witnesses Mr. Sloan as well as four of Mr. Sloan's coworkers who likewise were employed at Bridgeview Elementary Center at the time of the events relevant to the instant proceeding. By contrast, the Board called no witnesses in support of its case. *See infra* note 13 and accompanying text.

7. See *infra* Section III.A., for the pertinent definition of "sexual harassment".

8. The relevant definition of "immorality" is set forth in Section III.A., *infra.*

were, in fact, unwelcome by Ms. Akers or whether such statements had created a hostile work environment for her or otherwise interfered with her ability to perform her job. The Grievance Board also concluded that Mr. Sloan's punishment should be mitigated by his admission of wrongdoing and remorse for his actions; his previously stellar record of employment; and the Board's disparate treatment of Mr. Sloan in which it disciplined Mr. Sloan by way of termination yet disciplined another male service employee, Mr. Cooper, who essentially stalked a female coworker and was arrested for committing larceny of her personal property at the school at which they both worked during the 2001–2002 school year, by ultimately suspending him for six months, transferring him to a different school, and requiring him to obtain counseling.[9]

After the issuance of the Grievance Board's decision, the Board appealed to the Circuit Court of Kanawha County. By order entered December 13, 2004, the circuit court upheld the Grievance Board's decision finding no clear error. From this adverse decision, the Board now appeals to this Court.

## II.

## STANDARD OF REVIEW

In the instant proceeding, we are asked to review an appeal from a circuit court order which upheld a decision of the West Virginia Education and State Employees Grievance Board. The standard of review applicable to a ruling of the Grievance Board is set forth in W. Va.Code § 18–29–7 (1985) (Repl.Vol.2003):

The decision of the hearing examiner [of the West Virginia Education and State Employees Grievance Board] shall be final upon the parties and shall be enforceable in circuit court: Provided, That either party may appeal to the circuit court of the county in which the grievance occurred on the grounds that the hearing examiner's decision (1) was contrary to law or lawfully adopted rule, regulation or written policy of the chief administrator or governing board, (2) exceeded the hearing examiner's

statutory authority, (3) was the result of fraud or deceit, (4) was clearly wrong in view of the reliable, probative and substantial evidence on the whole record, or (5) was arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion....

.... The court may reverse, vacate or modify the decision of the hearing examiner or may remand the grievance to the chief administrator of the institution for further proceedings.

In this regard, we have interpreted this standard to require a multi-faceted method of review:

Grievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo.

Syl. pt. 1, *Cahill v. Mercer County Bd. of Educ.*, 208 W.Va. 177, 539 S.E.2d 437 (2000). Thus,

"[a] final order of the hearing examiner for the West Virginia Educational Employees Grievance Board, made pursuant to W. Va.Code, 18–29–1, *et seq.* (1985), and based upon findings of fact, should not be reversed unless clearly wrong." Syllabus Point 1, *Randolph County Board of Education v. Scalia*, 182 W.Va. 289, 387 S.E.2d 524 (1989).

Syl. pt. 1, *Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 465 S.E.2d 399 (1995). Mindful of these standards, we proceed to consider the parties' arguments.

## III.

## DISCUSSION

On appeal to this Court, the Board assigns error to the circuit court's ruling. Specifical-

---

9. For further discussion of Mr. Cooper's miscon-   duct and resultant discipline, see note 14, *infra.*

ly, the Board suggests that the circuit court erred by upholding the Grievance Board's (1) finding that Mr. Sloan's actions constituted immoral conduct rather than sexual harassment and (2) concluding that the punishment previously imposed upon Mr. Sloan by the Board should be mitigated and, thus, imposing less severe sanctions for his conduct. We will consider each of these assignments in turn.

### A. Sexual Harassment

■ The Board first argues that the circuit court erred by upholding the Grievance Board's conclusion that Mr. Sloan's behavior constituted immoral conduct rather than sexual harassment.[10] The Grievance Board found that the Board had not proven that Mr. Sloan's comments satisfied the definition of sexual harassment because it failed to present evidence that such comments created a hostile or intimidating working environment for Ms. Akers or that it otherwise interfered with her ability to perform her job. The Board disputes the Grievance Board's characterization of the underlying facts and suggests that Ms. Akers' continued association with Mr. Sloan following the various inappropriate exchanges was consistent with a typical victim's response to sexual harassment of ignoring the comments in the hopes that they would go away and not wanting to call attention to herself or the undesirable situation. By contrast, Mr. Sloan contends that the Grievance Board properly found that his actions constituted immoral conduct but that the evidence was not sufficient to support a finding of sexual harassment.

Instructive to our analysis in this regard is a brief review of the definitions of immorality

and sexual harassment as those terms are used in the context of board of education employee discipline proceedings.[11] We previously have explained that

[i]mmorality is an imprecise word which means different things to different people, but in essence it also connotes conduct "not in conformity with accepted principles of right and wrong behavior; contrary to the moral code of the community; wicked; especially, not in conformity with the acceptable standards of proper sexual behavior." Webster's New Twentieth Century Dictionary Unabridged 910 (2d ed.1979).

*Golden v. Board of Educ. of the County of Harrison,* 169 W.Va. 63, 67, 285 S.E.2d 665, 668 (1981). Immorality encompasses within its ambit sexual harassment, which we have "considered [to be] a species" of immorality. *Harry v. Marion County Bd. of Educ.,* 203 W.Va. 64, 67, 506 S.E.2d 319, 322 (1998).

Specifically, sexual harassment is defined in the State Board of Education's Racial, Sexual, Religious/Ethnic Harassment and Violence Policy, in relevant part, as follows:

... [s]exual harassment consists of unwelcome sexual advances, requests for sexual favors, sexually motivated physical conduct or other verbal or physical conduct or communication of a sexual nature when:

. . . .

that conduct or communication has the purpose or effect of substantially or unreasonably interfering with an individual's employment ... or creating an intimidating, hostile or offensive employment ... environment.

W. Va.C.S.R. §§ 126–18–4.1, 126–18–4.1.3 (1997).[12]

---

**10.** In explaining its decision to terminate Mr. Sloan's employment, the Board also indicated that Mr. Sloan's conduct amounted to insubordination insofar as his actions demonstrated a disregard for the Board's sexual harassment policy. Given that the nature of Mr. Sloan's grievance is limited to an inquiry as to whether his behavior constituted immoral conduct rather than sexual harassment, see *supra* note 5, we will not further examine the issue of insubordination.

**11.** A board of education may suspend or dismiss an employee who is found to have committed immoral acts. *See* W. Va.Code § 18A–2–8. Such discipline, and the authorizing statutory

authority, will be discussed in greater detail in Section III.B., *infra.*

**12.** The language of Kanawha County Schools' regulation prohibiting sexual harassment mirrors that of the State Board of Education:

[s]exual harassment consists of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature *constitute* sexual harassment [sic] when:

. . . .

such conduct has the purpose or effect of unreasonably interfering with an individual's

It goes without saying that Mr. Sloan's propositions to Ms. Akers satisfy the definition of immorality this Court earlier set forth in *Golden. See* 169 W.Va. at 67, 285 S.E.2d at 668. Not only were Mr. Sloan's comments inappropriate given that he made them to a coworker in a workplace setting, but they undoubtedly were "not in conformity with the acceptable standards of proper sexual behavior." *Id.* (internal quotations and citation omitted). More unclear, however, is whether Mr. Sloan's statements amounted to sexual harassment.

In order to find that Mr. Sloan's conduct constituted sexual harassment, he first must be found to have made the statements in question. *See* W. Va.C.S.R. § 126–18–4.1. The fact that Mr. Sloan made the above-described statements is not disputed, and he has repeatedly admitted to having made the statements at issue. Additionally, however, a determination of the existence of sexual harassment also requires a finding that Mr. Sloan's "conduct or communication ha[d] the purpose or effect of substantially or unreasonably interfering with an individual's [Ms. Akers'] employment . . . or creating an intimidating, hostile or offensive employment . . . environment." W. Va.C.S.R. § 126–18–4.1.3. Whether the comments created such an environment, however, has not been established by the record presented to us for appellate consideration.

During the Grievance Board proceedings, the Board presented no additional evidence [13] and tendered no witnesses, not even the complainant Ms. Akers, to testify as to the "sub-stantial[ ] or unreasonabl[e] interfer[ence]," W. Va.C.S.R. § 126–18–4.1.3, Mr. Sloan's comments had upon Ms. Akers' employment at Bridgeview. Nor did the Board prove that the encounters between Mr. Sloan and Ms. Akers created an "intimidating, hostile or offensive employment . . . environment," *id.,* for Ms. Akers. To the contrary, the numerous character witnesses presented by Mr. Sloan indicated that, rather than ending their friendship after Mr. Sloan had made these various propositions, Ms. Akers continued to leave her assigned work station in the cafeteria in order to go to Mr. Sloan's work area to converse with him on a daily basis during the lunch hour and that such interactions continued until the last day of the 2001–2002 school year. Neither did any of these witnesses indicate that they noticed a change in the relationship between Mr. Sloan and Ms. Akers, and they consistently testified that Ms. Akers was friendly with Mr. Sloan and laughed and joked with him. Based upon this evidence, and the absolute lack of evidence from the Board, from Ms. Akers, or from any other source, to the contrary, it is clear that the circuit court properly upheld the Grievance Board's decision finding that the Board had failed to sustain its burden of proof and concluding that Mr. Sloan's actions constituted immoral conduct but did not rise to the level of sexual harassment. Therefore, we affirm the circuit court's ruling in this regard.

### B. Termination

 The Board additionally assigns error to the circuit court's ruling upholding the

---

work performance . . . or creating an intimidating, hostile or offensive working . . . environment[.]

Kanawha County Schools Administrative Regulation Series G50A, §§ 50.03.1, 50.03.1.3 (2001). *Cf.* W. Va.C.S.R. §§ 126–18–4.1, 126–18–4.1.3 (1997). Additionally, the Kanawha County Schools policy also suggests the discipline warranted by such misconduct: "If the results of the investigation support disciplinary action, steps will be taken, which may include reprimand, suspension or termination of employment.... Any employee . . . who falsely reports . . . sexual . . . harassment shall be subject to the same disciplinary actions." Kanawha County Schools Administrative Regulation Series G50A, § 50.07. *Cf.* W. Va.Code § 18A–2–8 (authorizing suspension or dismissal for immorality; for the relevant text of W. Va.Code § 18A–2–8, see Section III.B.,

*infra* ); W. Va.C.S.R. § 126–18–8.1 (1997) (recommending sanctions for policy violation, including "warning, suspension, exclusion, . . . termination and revocation of licensure").

**13.** The evidence presented by the Board at the Level IV hearing consisted of the transcript of the predisciplinary hearing, at which Ms. Akers did not testify; its investigator's report and notes generated during her validation of Ms. Akers' initial complaint; and the Board's various letters and accompanying attachments corresponding with Mr. Sloan to advise him first of his paid suspension pending further inquiry into Ms. Akers' complaint and then informing him of the formal charges against him and the resulting predisciplinary hearing.

**220**

Grievance Board's decision to reinstate Mr. Sloan to his employment with the Board but to impose a three-day suspension, without pay, as punishment for his actions vis-a-vis Ms. Akers. In lessening the punishment originally imposed upon Mr. Sloan by the Board, the Grievance Board found that the Board had improperly and disparately punished Mr. Sloan when compared with another, similarly-situated Board employee and further that Mr. Sloan had presented sufficient evidence to mitigate such punishment. The Board complains that it had the authority to terminate Mr. Sloan for his immoral conduct, while Mr. Sloan contends that the Grievance Board properly reduced the severity of the Board's sanction.

■ Pursuant to W. Va.Code § 18A–2–8 (1990) (Repl.Vol.2004),

... a board [of education] may suspend or dismiss any person in its employment at any time for: Immorality .... The charges shall be stated in writing served upon the employee within two days of presentation of said charges to the board. The employee so affected shall be given an opportunity, within five days of receiving such written notice, to request, in writing, a level four hearing and appeals pursuant to provisions of article twenty-nine [§§ 18–29–1 et seq.], chapter eighteen of the code of West Virginia, one thousand nine hundred thirty-one, as amended....

Cf. Syl. pt. 2, Harry v. Marion County Bd. of Educ., 203 W.Va. 64, 506 S.E.2d 319 ("Misconduct by a school employee which can be characterized as sexual harassment can constitute a basis for the termination of the offending employee's employment."). Nevertheless, a board of education must act reasonably in imposing such discipline. "The authority of a county board of education to dismiss a[n employee] under W. Va.Code 1931, 18A–2–8, as amended, must be based upon the just causes listed therein and must be exercised reasonably, not arbitrarily or capriciously." Syl. pt. 3, in part, Beverlin v. Board of Educ. of the County of Lewis, 158 W.Va. 1067, 216 S.E.2d 554 (1975).

In the course of the Grievance Board proceedings, Mr. Sloan presented evidence suggesting that the Board's decision to terminate his employment was disproportionate to the discipline it had imposed upon Mr. Cooper, a similarly-situated school employee, for actions he had committed also during the 2001–2002 school year. Summarizing the other employee's conduct, and comparing it to Mr. Sloan's misdeeds, the Grievance Board observed as follows:

Grievant [Mr. Sloan] was an outstanding 27 year service employee, with no prior discipline, who propositioned a female coworker who left her work station everyday and stood close to him, telling him about her personal problems, joking, touching him, and asking him to loan her money, for 30 minutes at a time; and then Grievant admitted to his actions, and apologized. Grievant's coworkers testified as to what a supportive, good co-worker he was. Mr. Cooper was a satisfactory service employee, who stalked a female co-worker, stole items from her purse, and lied about what had happened while under oath.[14] Mr.

---

**14.** Earlier in its decision, the Grievance Board summarized the facts and circumstances surrounding Mr. Cooper's misconduct and resultant discipline in greater detail:

KBOE [the Board] dismissed Kenneth Cooper, a cook, on April 9, 2002, for theft, immorality, sexual harassment, and insubordination. The Superintendent had recommended a lengthy suspension. Mr. Cooper had become close friends with a female co-worker, loaning her money, transporting her to work, and giving her presents. He was obsessed with the co-worker, and occasionally followed her movements away from school. After observing the co-worker with another man at a store, Mr. Cooper became incensed, and confronted the co-worker outside the store about being with

this man. The next school day Mr. Cooper left the co-worker a juvenile note about being with this other man. Mr. Cooper talked to the principal about the co-worker, told him he was stressed and under a doctor's care, and the principal told him to follow his doctor's orders to stay home, and to stay away from the co-worker when he returned to work. An hour after this conversation, Mr. Cooper went to the school, went to the area where the co-worker was, and took a brass picture frame he had given her. Because he thought the co-worker owed him money, he also got into the zippered compartment of her purse and took four rings, all without the co-worker's knowledge or permission. The co-worker convinced Mr. Cooper to return one of the rings which her mother had given her. Mr. Cooper was arrested for

Cooper and Grievant are similarly situated in terms of their employment responsibilities. When one considers all the circumstances, which is what a board of education is supposed to do when deciding on an employee's livelihood, it is difficult to understand how Grievant's employment could be terminated. It is even more difficult to understand how KBOE could terminate Grievant's employment, yet reinstate Mr. Cooper. Certainly Mr. Cooper would seem to be more of a threat to his co-workers in the future than Grievant. . . .

(Footnote added). When compared with Mr. Cooper's improper behavior, the Grievance Board determined that Mr. Sloan's actions posed a much lesser threat both to the affected employee, *i.e.*, Ms. Akers, and to the school community at large. We agree with this assessment of the Board's recent disciplinary decisions and agree that when compared with Mr. Cooper, Mr. Sloan's punishment was unreasonable and disproportionate to the nature of his offense.

To further mitigate the punishment imposed upon Mr. Sloan, the Grievance Board took note of his twenty-seven year record of exemplary service, his outstanding job performance evaluations, and his lack of a prior disciplinary record, as well as his admission of the illicit comments he made to Ms. Akers, his truthfulness and cooperation throughout the disciplinary proceedings, his remorse for his actions, and his apologies therefor. Taking into account such factors to mitigate a punishment previously imposed upon a school board employee pursuant to W. Va.Code § 18A–2–8 is not without precedent. For example, in *Rovello v. Lewis County Board of Education*, 181 W.Va. 122, 381 S.E.2d 237 (1989) (per curiam), the employee, Mr. Rovello, was accused of seeking reimbursement for extraneous travel expenses. In short, Mr. Rovello had received approval to attend a professional conference and had asked a companion to accompany him on this trip. Upon

his return, however, Mr. Rovello listed the entirety of his expenses on his request for reimbursement, including those attributable to his companion, rather than just seeking reimbursement for his own expenses. At the time of these events, Mr. Rovello was under the impression that his companion's expenses were also reimbursable insofar as the governing board of education did not have a clear policy in place to govern such requests and because his predecessor had successfully requested reimbursement for such expenses. Upon consideration of the immoral conduct, however, the Board recommended dismissal of Mr. Rovello, which recommendation was upheld by the Grievance Board and the circuit court. In mitigation of the sanction of dismissal previously imposed, this Court considered that Mr. Rovello had demonstrated, among other things, that "he had rendered approximately twenty-five years of meritorious service" and that "he was not acting wilfully at the time of the infraction". *Id.*, 181 W.Va. at 126, 381 S.E.2d at 241. Determining that Mr. Rovello's prior discipline for this incident should be reduced, we additionally credited "the isolated nature of the [employee's] offense, his otherwise sterling record of long service, and the minimal harm to the school system." *Id.* Ultimately, this Court concluded that, despite Mr. Rovello's wrongful conduct, rather than being terminated, he "should be reinstated, but without back pay and without reimbursement for expenses in prosecuting this matter, so long as he reimburses the Lewis County Board of Education for the expenses which he improperly charged to the Board."

Considering all of the facts and circumstances surrounding the improper comments Mr. Sloan made to Ms. Akers, the nature of the offenses committed by Mr. Cooper and the resulting punishment the Board imposed upon him, and the other mitigating factors demonstrated by Mr. Sloan, we agree with

committing larceny. After his dismissal, Mr. Cooper called staff and faculty to enlist their support, and several felt they were harassed by Mr. Cooper. Mr. Cooper also called parents and told them of the co-worker's drug problems, and that the principal had done nothing about it. Mr. Cooper had satisfactory evaluations. By decision dated July 31, 2002, the

Grievance Board upheld the dismissal. The decision found that the credibility of Mr. Cooper's testimony was called into question. On August 23, 2002, KBOE rescinded the termination of Mr. Cooper's employment, and reduced the disciplinary action to a six month suspension, accompanied by a transfer to a different school, and counseling, as necessary.

the circuit court and the Grievance Board that the Board's dismissal of Mr. Sloan was too harsh a penalty for the instances of immorality he has been found to have committed. Nonetheless, neither do we agree with the recommendation of the Grievance Board, which was upheld by the circuit court, to reinstate Mr. Sloan to his employment less a three-day unpaid suspension commensurate with the three occurrences of immoral conduct. Rather, we believe that given the egregious nature of the comments, both in terms of their overall inappropriateness and the environment in which they were communicated in which the ever-attentive ears of young school children could have easily heard and absorbed such lewd statements, a six-month unpaid suspension is the more appropriate discipline for Mr. Sloan in this case. Accordingly, we reverse that portion of the circuit court's order upholding the recommended three-day unpaid suspension and, instead, impose a six-month unpaid suspension. We further remand this matter to the circuit court for further proceedings consistent with the imposition of this revised discipline.

## IV.

### CONCLUSION

For the foregoing reasons, the December 13, 2004, order of the Circuit Court of Kanawha County is hereby affirmed in part and reversed in part. We further remand this matter for further proceedings consistent with this opinion.

Affirmed in part, Reversed in part, and Remanded.

BENJAMIN, Justice, concurring, in part, and dissenting, in part.

(Filed July 19, 2006)

I concur with the majority's decision to affirm the circuit court's order upholding the

---

Grievance Board's finding that Mr. Sloan had committed immoral conduct, rather than sexual harassment, and reversing the Grievance Board's decision to impose only a three-day unpaid suspension as the appropriate discipline for such offense. I dissent, however, from the majority's decision for this Court itself to determine the appropriate discipline from the appellate level, rather than remanding this issue to the Grievance Board which, in its role as fact-finder, had, among other things, the benefit of observing witness demeanor to guide its determination of appropriate discipline. While I agree that the Grievance Board was clearly wrong in imposing a three-day unpaid suspension, a mere slap on the wrist for the serious offense committed, this finding does not, I believe, strip the Grievance Board of its discretion to determine a more appropriate punishment.

The Legislature has vested the Grievance Board with the responsibility to serve as fact-finder in employee grievance proceedings, including an employee's appeal of disciplinary action taken by a local school board.[1] In its role as fact-finder, the Grievance Board necessarily must make credibility determinations which impact its conclusions as to the appropriate discipline for the offense or offenses committed. While this discretion is not unlimited, such as where the discipline is unduly light or harsh under the circumstances, this discretion is required to determine appropriate disciplinary sanctions.

A fact-finder, such as the Grievance Board, has the advantage of a three dimensional view of facts, including not just the black and white of what was said, but also witness demeanor and tone. On appeal, we are limited to a two-dimensional review of the facts as revealed in the written transcript of what was said, without the benefit of visually and audibly observing the witness' demeanor and tone.[2] As such, I believe it is more appropri-

---

1. W. Va.Code § 18A–2–8 (1990) authorizes an employee to appeal a school board's disciplinary action directly to a Level IV hearing before the Grievance Board.

2. In the criminal law context, Justice Maynard has aptly summarized this principle, stating,

    sentencing, and especially whether to grant probation or not, is usually best left to trial

judges. This is so for several reasons. Chief among them is the fact that the trial judge sees the defendant in person, interacts with him or her, can see the defendant's demeanor and attitude, and observes a hundred other subtle factors which enable the trial judge to determine the defendant's remorse or lack thereof. Since this Court never sees the defendant, we cannot make the same crucial observations.

ate to remand this matter to the Grievance Board for the determination of the appropriate sentence in light of our determination that the discipline previously imposed was a grossly inadequate punishment in light of the severity of the offense committed. *See, e.g., State v. Richardson,* 214 W.Va. 410, 416, 589 S.E.2d 552, 558 (2003) (Davis, J., concurring, in part, and dissenting, in part) (recognizing that determination of appropriate sentence to be imposed should ordinarily be determined by the trial court on remand, rather than at the appellate level).

Accordingly, I respectfully dissent from my colleagues' decision to determine the discipline to be imposed at the appellate level. I would, instead, have directed this matter be remanded to the Grievance Board for its reconsideration of the sentence to be imposed in light of our decision that the discipline previously imposed was inadequate.

Therefore, absent some truly horrible mistake, I would leave criminal sentencing and probation decisions to the sound discretion of our very wise trial judges.

*State v. Arbaugh,* 215 W.Va. 132, 151, 595 S.E.2d 289, 308 (2004) (*per curiam*) (Maynard, J., dissenting).